IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JUDY KIRKBRIDE, individually and on behalf of all others similarly situated, | ) Case No. <br> ) <br> ) **CLASS ACTION COMPLAINT** |
| Plaintiff, | ) <br> ) |
| vs. | ) **JURY TRIAL DEMANDED** <br> ) <br> ) |
| THE KROGER CO., | ) <br> ) |
| Defendant. | ) <br> ) |

Plaintiff Judy Kirkbride ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Through this class action, Plaintiff alleges that Defendant The Kroger Co. ("Kroger" or "Defendant") engaged in a fraudulent and deceptive pricing scheme to overcharge customers with third-party insurance providers ("TPPs") on purchases of generic prescription medication. Specifically, in its submissions to TPPs, Kroger inflated the "usual and customary" ("U&C") prices at which it sold generic prescription drugs. Kroger should have listed its U&C prices at the lowest amounts at which it sold medications, including through its Rx Savings Club ("RxSC"), but it instead used highly inflated prices. Because TPPs use U&C prices to set copayment amounts, the result of Kroger's inflated U&C prices was that Plaintiff and other consumers paid far more for generic drugs than they should have.

2. Put another way, the gravamen of this action is not that Kroger concealed the

existence of the RxSC program. Rather, it is that, contrary to industry standards, Kroger deceived Plaintiff and class members by reporting U&C prices above the prices available to members of the RxSC program, and then charged Plaintiff and class members inflated copays as a result of their deception.

3. Plaintiff brings this action on behalf of herself and a class of all consumers nationwide who purchased generic drugs from Defendant using third-party insurance.

## PARTIES

4. Plaintiff Judy Kirkbride is domiciled in the State of Ohio and resides in Hebron, Ohio. After contracting Covid-19 in early December 2020, Ms. Kirkbride's doctor prescribed her two generic medications: Doxycycline Hylate, 100 mg, 20 tablets and Benzontate, 200 mg, 30 tablets. On or about December 7, 2020, Ms. Kirkbride filled these two prescriptions at the Kroger Pharmacy located at 600 E. Main Street in Hebron, OH, and paid using her Anthem MediBlue HMO insurance coverage. At the time of this transaction, Kroger reported to Anthem that the U&C price for the Doxycycline was $88.49 and the U&C price for the Benzontate was $44.49. Based on these representations, Anthem set Ms. Kirkbride's copayments at $11.79 for the Doxycycline and the full $44.49 for the Benzontate, for a total out-of-pocket cost of $56.28. But, unbeknownst to Ms. Kirkbride, Kroger had reported inflated U&C prices to Anthem, which inflated her copayments. Through its RxSC, Kroger sells Doxycycline Hylate, 100 mg, 20 tablets for just $9.82 and Benzontate, 200 mg, 30 tablets for just $6.00. Accordingly, with a $36 RxSC annual membership fee, Ms. Kirkbride should have paid no more than $51.82 in total. In other words, as a result of Kroger inflating its U&C prices, Ms. Kirkbride paid at least $4.46 more in copayments for her generic prescriptions.

| **Item** | **Kroger's Reported U&C** | **Amount Covered By Insurance** | **Plaintiff's Copayment** | **Kroger's RxSC Price** |
|---|---|---|---|---|
| Doxycycline Hylate, 100 mg, 20 tablets | $88.49 | $76.70 | $11.79 | $9.82 |
| Benzontate, 200 mg, 30 tablets | $44.49 | $0.00 | $44.49 | $6.00 |
| RxSC Membership Fee | n/a | n/a | n/a | $36.00 |
| **TOTAL** | | | **$56.28** | **$51.82** |

Plaintiff paid the above amounts with the understanding that the U&C prices that Kroger reported to TPPs were the actual U&C prices paid by cash-paying customers, and she would not have paid those inflated amounts but for Kroger's wrongful conduct.  Due to the need for continuity of access and care, Plaintiff anticipates filling future prescriptions for generic drugs at Kroger, and thus, faces the prospect of paying additional inflated copayments in the future if Kroger continues its wrongful conduct.

5. Defendant The Kroger Co. is an Ohio corporation with its principal place of business at 1014 Vine Street, Cincinnati, Ohio.  Defendant owns and operates over 2,300 pharmacies at supermarkets with various brand names, including but not limited to Kroger, Ralphs and Smith's.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

7. This Court has personal jurisdiction over Defendant because Defendant is headquartered in Ohio and it conducts substantial business within Ohio such that Defendant has

significant, continuous, and pervasive contacts with the State of Ohio.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this District, it does substantial business in this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## COMMON FACTUAL ALLEGATIONS

9. When a participant in a private or public healthcare plan fills a prescription, the plan pays a portion of the costs and the plan participant pays the remainder in the form of a copayment, or copay, which may include co-insurance, flat fees, or deductibles.

10. Even though plan participants cannot and do not negotiate the price charged by pharmacies such as Kroger for prescription drugs, and do not negotiate the copayment price for the drug in any given transaction, they are required to pay Kroger a copayment amount in order to receive the prescription.

11. The National Council for Prescription Drug Programs ("NCPDP")[1] sets the industry standards for the electronic transmission of pharmacy claims to third-party payors. Kroger follows this uniform process at its pharmacies for each prescription drug transaction.

12. When a customer fills a prescription at a Kroger pharmacy, the pharmacist or pharmacy technician enters the prescription information and any applicable insurance or benefit information into Kroger's computerized claims processing system. Kroger then submits the claim to the customer's TPP or its agent.

13. The NCPDP provides a standardized form for Kroger to fill out and send to TPPs when filling prescriptions. The form includes Transmission Pricing Record Field No. 426-DQ,

---

[1] NCPDP is a non-profit organization that develops industry standards for electronic healthcare transactions used in prescribing, dispensing, monitoring, managing, and paying for medications and pharmacy services. Its membership is made up of approximately 1,500 stakeholders from across the pharmaceutical industry, including pharmacies, pharmacists, health plans, and government agencies.

4

where Kroger is required to report its "usual and customary" price of the prescription being filled. The NCPDP Reference Manual on Flat File Format defines the term "usual and customary" as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."

14. This definition of "usual and customary" price is followed by pharmacy benefit managers ("PBMs"). For instance, Express Scripts, Inc., a PBM that includes Kroger in its network, defines the "Usual and Customary Retail Price" in its Pharmacy Network Manual as "[t]he usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, **including any discounts** or special promotions offered on such date." Another large PBM, Prime Therapeutics LLC, which also includes Kroger in its network, defines "Usual and Customary Charge" in its Pharmacy Provider Manual as "the lowest price the Participating Pharmacy would charge to a particular [customer] if that customer [were] paying cash for the identical Prescription Drug Services on the date dispensed. **This includes any applicable discounts including**, but not limited to, senior discounts, **frequent shopper discounts** and other special discounts offered to attract customers."

15. Based on the U&C price that Kroger reports on the NCPDP's standard form, the TPP identifies the appropriate copayment amount that the customer must pay Kroger for the transaction.

16. Pursuant to contracts between Kroger and TPPs, the amount of the copayment cannot exceed the U&C price. This pricing structure matches consumers' expectations. Participants in private or public healthcare plans reasonably expect to pay less than cash-paying customers who do not have insurance coverage. Otherwise, not only would they receive no benefit from their insurance, but they would, in fact, be punished for having insurance.

17. In 2018, Kroger launched its Rx Savings Club. Offered at an annual fee of $36 for individuals and $72 for families, RxSC provides deep discounts to cash purchasers on many commonly prescribed generic drugs. Specifically, through the RxSC, Kroger offers 30-day prescriptions of many generic drugs for $6, $3 or even for free.

18. Because these discounts are so attractive, most of Kroger's cash-paying customers now pay the RxSC price. In other words, the RxSC price is now the price at which Kroger sells generic prescriptions to cash-paying customers as a usual and customary matter. As such, Kroger should list its loyalty discount prices as its U&C prices, which is what other national retail pharmacies such as Wal-Mart, Target, and Costco do.

19. But Kroger continues to list its inflated non-RxSC prices as its U&C prices in an effort to bolster its profits. Kroger routinely sells generic medications at $6, $3 or even for free, but it continues to report to TPPs that the U&C for these medications are actually much higher.

20. By way of example, Kroger lists the U&C price for 30 200 mg capsules of Celecoxib as $190.98 even though it routinely sells the same prescription for just $6.00.



As a result, consumers with insurance end up paying far more than they should. Participants in high deductible plans can end up paying the full amount each month, for a total of $2,291.76 per year. Consumers with a copayment of $10.00 end up paying $120.00 per year. But both should

pay no more than $108.00 per year: the $36 RxSC membership fee plus the $6.00 per month RxSC price.

21. Similarly, Kroger lists the U&C price for 90 20 mg tablets of Atorvastatin at $109.04 even though it routinely sells the same prescription for just $12.00.



As a result, again, consumers with insurance end up paying far more than they should. Participants in high deductible plans can end up paying the full amount every three months, for a total of $1,308.48. Consumers with a copayment of $10.00 end up paying $120.00 per year. Both should pay no more than $84.00: the $36 RxSC membership fee plus the $12.00 RxSC price every three months. Other examples abound.

22. The relationship between a pharmacy and its customers is unique, special, and important. Pharmacists, including those at Kroger, do more than just dispense medicine. Pharmacists discuss with customers how they should take medications, counsel customers on the use of medicine (whether over-the-counter or prescription), and advise customers on general health topics, such as diet and exercise. Trust is an essential component of the relationship between a pharmacist and a customer. For instance, a customer needs to trust a pharmacist that a generic drug is just as effective as its brand-name counterpart. Indeed, customers have come to

expect such advice, and further, that pharmacists will provide them with ways to save money, such as using generics when available, without prompting.

23. Kroger has acknowledged this special relationship. On its website, Kroger notes that its pharmacists "provide more than just prescriptions and over-the-counter medications; they provide advice and support . . . ." In addition, Kroger touts that its pharmacists "provide more than just medication expertise — they're dedicated to helping you stay healthy and happy with a full range of Convenience Tools, Saving Programs & Personalized Health Services."

## CLASS REPRESENTATION ALLEGATIONS

24. Plaintiff seeks to represent a class defined as all persons in the United States who paid for, in full or in part, a prescription generic drug that Kroger included in its Rx Savings Club, and who were insured for the purchase through a third-party payor.

25. Plaintiff also seeks to represent a subclass defined as all persons in the state of Ohio who paid for, in full or in part, a prescription generic drug that Kroger included in its Rx Savings Club, and who were insured for the purchase through a third-party payor.

26. At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass ("Class Members" and "Subclass Members," respectively); however, given the nature of the claims and the number of pharmacies in the United States that Kroger owns and operates, Plaintiff believes that Class and Subclass members are so numerous that joinder of all members is impracticable.

27. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

    a. whether Kroger misrepresented their U&C prices;

    b. whether Kroger overcharged Class Members and Subclass Members;

    c. whether Kroger's conduct was unfair and/or deceptive;

    d. whether Kroger has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for it to retain the benefits conferred upon it by Plaintiff and the Class and/or Subclass;

    e. whether Plaintiff and the Class and/or Subclass have sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages.

28.    Plaintiff's claims are typical of those of the Class and Subclass because Plaintiff, like all members of the Class and Subclass, purchased generic prescription medication from Kroger using her insurance and, as a result, was charged more than she should have.

29.    Plaintiff will fairly and adequately protect the interests of the Class and Subclass and has retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interest that conflicts with those of the Class or the Subclass.

30.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

31.    The prosecution of separate actions by members of the Class and the Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Class and the Subclass even where certain Class or Subclass members are not parties to such actions.

# COUNT I
## Fraud

32. Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

33. Plaintiff brings this Count individually and on behalf of the other members of the Class and Subclass.

34. Kroger materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the RxSC program. Kroger made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to TPPs. Kroger made a false representation every time it charged Plaintiff or class members for copays that were calculated based on inflated U&C prices.

35. Kroger made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that Kroger knew the prices that it reported to TPPs were substantially (and unjustifiably) higher than the prices it charged under its RxSC program to cash-paying customers.

36. Kroger intended to induce Plaintiff and other consumers to rely on its misrepresentations and/or omissions. Kroger knew that Plaintiff and other consumers would rely on its representations and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for generic prescription drugs. Other indicia of intent are: (a) Kroger's practice of not factoring the RxSC price into the U&C price contravened industry standards; (b) other major industry players—such as Wal-Mart, Target, and Costco—report their discount program prices as their U&C prices; and (c) Kroger created the RxSC program to stay competitive in the market's new discounted pricing norm while fraudulently charging third-party payors and their members a higher price.

37. Plaintiff and other consumers justifiably relied on Kroger's misrepresentations

10

and/or omissions in that they would not have purchased generic prescription drugs from Kroger for more than the RxSC prices but for Kroger's misrepresentations and/or omissions. Plaintiffs' and other consumers' reliance on Kroger's misrepresentations and/or omissions was, thus, to their detriment.

38. As a proximate result of Kroger's conduct, Plaintiff and other consumers have been damaged because they paid copayments for generic prescription drugs that were higher than the prices they would have paid but for Kroger's misconduct.

39. Kroger is therefore liable to Plaintiff and Members of the Class and Subclass for the damages they sustained.

## COUNT II
### Negligent Misrepresentation

40. Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

41. Plaintiff brings this Count individually and on behalf of the other members of the Class and Subclass.

42. Under the circumstances alleged, Kroger owed a duty to Plaintiff, and Members of the Class and Subclass, to provide them with accurate information regarding the prices of its generic prescription drugs.

43. Kroger misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the RxSC. Kroger made such misrepresentations by reporting artificially inflated U&C prices for such drugs to third-party payors.

44. Kroger had no reasonable grounds to believe that these misrepresentations and/or omissions were true. The prices that Kroger reported to TPPs were substantially (and unjustifiably) higher than the prices it charged under its RxSC to cash-paying customers.

45. Kroger intended to induce Plaintiff, the Class, and Subclass to rely on its

misrepresentations and/or omissions. Kroger knew that Plaintiff, the Class, and Subclass would rely on its misrepresentations and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

46. Plaintiff, the Class, and Subclass justifiably relied upon Kroger's misrepresentations and/or omissions in that Plaintiff, the Class, and Subclass would not have purchased generic prescription drugs from Kroger for more than the RxSC prices but for Kroger's misrepresentations and/or omissions. Their reliance on Kroger's misrepresentations and/or omissions was, thus, to their detriment.

47. As a proximate result of Kroger's negligent conduct, Plaintiff, the Class, and Subclass have been injured because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for Kroger's misconduct.

48. Kroger is therefore liable to Plaintiff, the Class, and Subclass for the injuries they sustained.

## COUNT III
### Unjust Enrichment

49. Plaintiff incorporates by reference and realleges herein all paragraphs alleged above.

50. Plaintiff brings this Count individually and on behalf of the other members of the Class and Subclass.

51. To the extent required by law, this claim is alleged in the alternative, as permitted under Federal Rule of Civil Procedure 8.

52. By means of Kroger's wrongful conduct alleged herein, Kroger knowingly charges plan participants artificially high copayments for generic prescription drugs included in the RxSC in a manner that is unfair and unconscionable.

53. Kroger knowingly received and retained wrongful benefits and funds from

Plaintiff, the Class, and Subclass. In so doing, Kroger acted with conscious disregard for the rights of Plaintiff, the Class, and Subclass.

54. As a result of Kroger's wrongful conduct as alleged herein, Kroger has been unjustly enriched at the expense of, and to the detriment of Plaintiff, the Class, and Subclass.

55. Kroger's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

56. Under the common law doctrine of unjust enrichment, it is inequitable for Kroger to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of artificially inflated prices on Plaintiff, the Class, and Subclass in an unfair and unconscionable manner. Kroger's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

57. Plaintiff, the Class, and Subclass did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Kroger to retain these wrongfully obtained proceeds.

58. Kroger is therefore liable to Plaintiff, the Class, and Subclass for restitution in the amount of Rite Aid's wrongfully obtained profits.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class and Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass members;

13

b.      For an order declaring the Defendant's conduct violates the laws referenced herein;

c.      For an order finding in favor of Plaintiff, the Class, and Subclass on all counts asserted herein;

d.      For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For an order of restitution and all other forms of equitable monetary relief;

g.      For an order requiring Defendant to list accurate undertake U&C prices;

h.      For injunctive relief as pleaded or as the Court may deem proper; and

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

DATED: January 5, 2021

*/s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA &
GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
sdsimp@climacolaw.com

Joshua D. Arisohn (*pro hac vice* forthcoming)
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com

Joel D. Smith (*pro hac vice* forthcoming)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596

Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jsmith@bursor.com

*Attorneys for Plaintiff*