**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JUDY KIRKBRIDE and BEETA LEWIS, individually and on behalf of all others similarly situated,     ) | Case No. 2:21-cv-00022-ALM-EPD |
|     ) | |
|     ) | Chief Judge Algenon L. Marbley |
|     ) | Magistrate Judge Elizabeth Deavers |
| Plaintiffs,     ) | |
|     ) | |
| vs.     ) | |
|     ) | |
| THE KROGER CO.,     ) | |
|     ) | |
| Defendant.     ) | |
|     ) | |

## <u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

For the reasons set forth in the attached memorandum, Plaintiffs move to certify the

following classes pursuant to Fed. R. Civ. P. 23:

> **<u>The Ohio Medicare Class</u>:**  All persons in Ohio who, at any point in time from the period December 9, 2018 through the date on which class notice is disseminated, paid in whole or in part for a prescription drug from The Kroger Co. using their Medicare supplement insurance and where the amount paid was more than the Kroger Rx Savings Club price for that drug.

> **<u>The Ohio Caremark Class</u>:**  All persons in Ohio for whom prescription drug insurance benefits were provided through Caremark, LLC and who, at any point in time from the period December 9, 2018 through the date on which class notice is disseminated, paid in whole or in part for a prescription drug from The Kroger Co. using their insurance where the amount paid was more than the Kroger Rx Savings Club price for that drug.

> **<u>The Texas Caremark Class</u>:** All persons in Texas for whom prescription drug insurance benefits were provided through Caremark, LLC and who, at any point in time from the period December 9, 2018 through the date on which class notice is disseminated, paid in whole or in part for a prescription drug from The Kroger Co. using their insurance where the amount paid was more than the Kroger Rx Savings Club price for that drug.

> **<u>The Texas Express Scripts Class</u>:** All persons in Texas for whom prescription drug insurance benefits were provided through Express Scripts, Inc. and who, at any point in time from the period December 9, 2018 through the date on which class notice is disseminated, paid in whole or in part for a prescription drug from The Kroger Co. using their insurance where the amount paid was more than the Kroger Rx Savings Club price for that drug.

Dated: February 26, 2024               Respectfully submitted,

*/s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA &**
**GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile:  (216) 771-1632
sdsimp@climacolaw.com

Joshua D. Arisohn (admitted *pro hac vice*)
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Fl.
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: jarisohn@bursor.com

Joel D. Smith (admitted *pro hac vice*)
**SMITH KRIVOSHEY, P.C.**
867 Boylston Street
5th Floor, #1520
Boston, MA 02116
Tel: 617-377-7404
E-mail: joel@skclassactions.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JUDY KIRKBRIDE and BEETA LEWIS, individually and on behalf of all others similarly situated, | ) ) ) ) | Case No. 2:21-cv-00022-ALM-EPD |
| | ) | Chief Judge Algenon L. Marbley |
| | ) | Magistrate Judge Elizabeth Deavers |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| THE KROGER CO., | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION FOR CLASS CERTIFICATION**

**REDACTED**

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF COMMON FACTS AND CLASSWIDE EVIDENCE ...................................... 3

I.    THE U&C PRICE ENSURES THAT INSURED CUSTOMERS DO NOT PAY MORE FOR PRESCRIPTION DRUGS THAN CASH CUSTOMERS ............................................................................................................ 3

II.    KROGER FACED COMPETITIVE PRESSURE ON U&C PRICING .............................. 4

III.    KROGER ADMITS THAT WHEN IT REPORTED U&C PRICING FOR INSURANCE TRANSACTIONS, IT EXCLUDED SAVINGS CLUB PRICES ........................................................................................................... 5

IV.    KROGER WAS REQUIRED TO INCLUDE ITS SAVINGS CLUB PRICING WHEN REPORTING U&C PRICES .................................................. 6

    A.    Governing Law .......................................................................................... 6

    B.    Industry Standards ..................................................................................... 7

    C.    Kroger's Contracts With Caremark and ESI ............................................. 8

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

I.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a) .................................................................................................... 10

    A.    The Proposed Classes Satisfy the Numerosity Requirement .................... 10

    B.    Questions of Fact and Law Are Common to the Proposed Class ............... 10

    C.    Plaintiffs' Claims Are Typical of the Class .............................................. 11

    D.    Plaintiffs and their Counsel Will Fairly and Adequately Represent the Classes ............................................................................................. 12

II.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(b)(3) ............................................................................................... 13

    A.    Common Factual and Legal Questions Will Predominate Over Any Individual Issues ..................................................................................... 13

        1.    Fraud ............................................................................................ 13

        2.    Unjust Enrichment ....................................................................... 16

        3.    Negligent Misrepresentation ........................................................ 17

    B.    Plaintiffs Have A Method For Calculating Damages on a Classwide Basis ...................................................................................... 18

    C.    A Class Action is Superior to Thousands of Individual Lawsuits ............. 19

    D.    The Proposed Class Is Ascertainable ....................................................... 19

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Beattie v. CenturyTel, Inc.*,
   511 F.3d 554 (6th Cir. 2007) ................................................................................. 11

*Castillo v. Morales, Inc.*,
   302 F.R.D. 480 (S.D. Ohio 2014) ......................................................................... 10

*Cerdant, Inc. v. DHL Express (USA). Inc.*,
   2010 WL 3397501 (S.D. Ohio Aug. 25, 2010).......................................................... 20

*City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc.*,
   736 S.W.2d 247 (Tex.App.-Corpus Christi 1987) ...................................................... 17

*Compound Prop. Mgmt. LLC v. Build Realty, Inc.*,
   2023 WL 2140981 (S.D. Ohio Feb. 21, 2023)........................................................... 18

*Cope v. Metro. Life Ins. Co.*,
   82 Ohio St. 3d 426 (1998) .................................................................................. 15

*Corcoran v. CVS Health Corp.*,
   779 F. App'x 431 (9th Cir. 2019) .......................................................................... 3

*Correct Rx Pharmacy Servs., Inc. v. Cornerstone Automation Sys., LLC*,
   2018 WL 4680568 n.5 (N.D. Tex. Sept. 28, 2018).................................................... 17

*Daldav Assocs., L.P. v. Lebor*,
   391 F. Supp. 2d 472 (N.D. Tex. 2005) ................................................................... 14

*Eaton v. Ascent Res. – Utica, LLC*,
   2021 WL 3398975 (S.D. Ohio Aug. 4, 2021)........................................................... 18

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)......................................................................................... 10

*Ewalt v. GateHouse Media Ohio Holdings II, Inc.*,
   2023 WL 2018775 (S.D. Ohio Feb. 15, 2023)......................................................... 14

*Famular v. Whirlpool Corp.*,
   (S.D.N.Y. Mar. 19, 2019) 2019 WL 1254882 ......................................................... 13

*Fed. Land Bank Ass'n of Tyler v. Sloane*,
   825 S.W.2d 439 (Tex. 1991)................................................................................ 17

*Fenley v. Wood Grp. Mustang, Inc.*,

325 F.R.D. 232 (S.D. Ohio 2018) ........................................................................... 16

*Forth v. Walgreen Co.*,
2018 WL 1235015 n.9 (N.D. Ill. Mar. 9, 2018) ......................................................... 7

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981) ................................................................................................. 10

*Hale v. Enerco Group*,
288 F.R.D. 139 (N.D. Ohio Dec. 29, 2012) .............................................................. 15

*Harris Cnty., Texas v. Eli Lilly & Co.*,
2020 WL 5803483 (S.D. Tex. Sept. 29, 2020) ......................................................... 14

*Hogan v. Cleveland Av. Restaurant, Inc.*,
2023 WL 5745439 (S.D. Cal. Sept. 6, 2023) ........................................................ 9, 12

*Horsemen's Benevolent & Protective Ass'n v. Belterra Park*,
2023 WL 2712395 (S.D. Ohio Mar. 30, 2023) ......................................................... 16

*Hurt v. Commerce Energy, Inc.*,
2015 WL 1298674 (N.D. Ohio Mar. 23, 2015) ......................................................... 18

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (1996) ............................................................................................... 11

*In re Polyurethane Foam Antitrust Litig.*,
2014 WL 6461355 (N.D. Ohio Nov. 17, 2014) ......................................................... 18

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) ............................................................................ 15, 16

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) ........................................................... 10, 11, 13, 18

*Johnson v. Maund Auto. Grp., L.P.*,
2004 WL 1792400 (Tex. App. Aug. 12, 2004) ......................................................... 17

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ............................................................................. 16

*Melgar v. Zicam, LLC*,
2014 WL 5486676 ((E.D. Cal. Oct. 29, 2014) ......................................................... 13

*Menocal v. GEO Grp., Inc.*,
882 F.3d 905 (10th Cir. 2018) ............................................................................... 16

*Myers v. Marietta Mem'l Hosp.*,
2017 WL 3977956 (S.D. Ohio Sept. 11, 2017) ......................................................... 13

*Pfaff v. Whole Foods Mkt. Grp. Inc.*,
    2010 WL 3834240 (N.D. Ohio Sept. 29, 2010) .................................................................. 16

*Rikos v. Procter & Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015) ................................................................. 10, 11, 15

*Rodney v. Nw. Airlines, Inc.*,
    146 F. App'x 783 (6th Cir. 2005) ............................................................................... 18

*Stout v. J.D. Byrider*,
    228 F.3d 709 (6th Cir. 2000) ..................................................................................... 12

*United States ex rel. Garbe v. Kmart Corp.*,
    73 F. Supp. 3d 1002 (S.D. Ill. 2014) ........................................................................... 4

*United States ex rel. Garbe v. Kmart Corp.*,
    824 F.3d 632 (7th Cir. 2016) ........................................................................... 4, 6, 7

*United States v. SuperValu Inc.*,
    9 F.4th 455 (7th Cir. 2021) ........................................................................................ 6

*Walmart Stores, v. Dukes*,
    564 U.S.338 (2011) .................................................................................................. 10

*Welfare & Benefit Fund v. CVS Pharmacy, Inc.*,
    540 F. Supp. 3d 182 (D.R.I. 2021) ............................................................................. 3

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ............................................................................... 9, 20

*Youngblood v. Linebarger Googan Blair & Sampson, LLP*,
    2012 WL 4597990 (W.D. Tenn. Sept. 30, 2012) ...................................................... 16

**RULES**

Fed. R. Civ. P. 23 .......................................................................................................... 1, 9

Fed. R. Civ. P. 23 (A)10 ................................................................................................... 10

Fed. R. Civ. P. 23 (a) and (b) ..................................................................................... 13, 19

Fed. R. Civ. P. 23 (a)(1) ................................................................................................... 10

Fed. R. Civ. P. 23 (a)(2) ................................................................................................... 10

Fed. R. Civ. P. 23 23(a)(3) ............................................................................................... 11

Fed. R. Civ. P. 23 (B)(3)13 ..................................................................................... 9, 13, 19

**REGULATIONS**

45 C.F.R. §162.1102(a)(2) ................................................................................................................. 4

## <u>INTRODUCTION</u>

Pharmacies categorize their customers purchasing prescription medication as either insured customers or cash customers.  Ex. 81 (Expert Report of Kenneth W. Schafermeyer, Ph.D. ("Schafermeyer Rpt.")) ¶ 26.[1]  Insured customers use insurance through which a third-party payer pays for some or all of the cost of prescriptions.  All customers who do not use insurance are cash customers.  *Id.*

It is a governing principle in the pharmaceutical industry that insured customers should not pay more for prescription drugs than cash customers.  Otherwise, they would receive no benefit from using insurance, and instead would be penalized for using insurance.  To enforce this principle, the pharmaceutical industry relies on two interrelated concepts:  (1) "usual and customary" ("U&C") price, and (2) "lower-of" pricing.

The U&C price is the lowest price a pharmacy offers to cash customers to purchase a prescription drug, including prices offered through any type of discount.  Every time a pharmacy sells a prescription drug to an insured customer, the pharmacy is required to report its U&C price for that drug as part of the standardized claims adjudication process.  Reporting U&C prices guarantees that insured customers pay the "lower of" the pharmacy's U&C price or the rate negotiated through insurance.  The U&C price thus serves as a price ceiling and represents the most that an insured customer should pay for a prescription drug.  Without lower-of pricing, insured customers would effectively be punished for using their insurance.

In 2018, Kroger launched a program called Kroger Rx Savings Club ("Savings Club" or "RxSC"), which aimed to increase Kroger's market share among uninsured cash customers by offering them steeply discounted prices for the most commonly prescribed generic drugs.  But

---

[1] Unless noted otherwise, all exhibits cited in this brief are attached to the concurrently filed Declaration of Joel D. Smith in Support of Plaintiffs' Motion for Class Certification.

the Savings Club program created a dilemma for Kroger:  the discounted Savings Club prices would need to be reported as U&C prices, which in turn would require Kroger to reduce the price of drugs to insured customers and lower its profits.  Kroger did not want to do that so, instead, it simply excluded Savings Club prices from the U&C prices it reported in insurance transactions. The result was that insured customers often paid more for drugs than uninsured customers who used the Savings Club and Kroger saved tens of millions of dollars in profits.  But, by doing so, Kroger violated the law and industry standards.  Kroger also breached its contracts with two pharmacy benefit managers ("PBM") at issue here, Caremark Inc. ("Caremark") and Express Scripts, Inc. ("ESI"), though Caremark and ESI appear to have colluded with Kroger by looking the other way in exchange for a share of the overcharges.

This case is suitable for class certification because it turns on common questions that can be resolved with common evidence.  As this Court correctly explained when denying Kroger's motion to dismiss, "[a]t its core, Plaintiffs' case concerns Kroger's definition of its 'usual and customary' prices, which are used to calculate copayments for insured customers."  MTD Order (ECF No. 42) at 2.  Kroger admits that it never included its Savings Club prices when determining the U&C price for transactions at issue for the Classes.  Ex. 76 (Def.'s 6/2/2023 Responses to Requests for Admission) at RFA Nos. 1-2 (admitting that it "exclude[s] Kroger Rx prices when determining which U&C prices to report in connection with insurance transactions administered by Caremark, LLC" and "Express Scripts, Inc.").  The core question of whether Kroger was required to do so can be answered with a binary "yes" or "no" applicable to all class members.  And the answer to that question may be found in the industrywide definition of the U&C price, governing regulations and case law, and Kroger's contracts with Caremark and ESI—all of which apply on a classwide basis and establish Kroger's liability.

Finally, as this Court correctly explained when denying Kroger's motion to dismiss, this

2

is not the first time a class action has challenged a major pharmacy for overcharging insured customers by failing to report savings club prices as U&C prices. *See* MTD Order (ECF No. 42) at 4 (surveying similar cases). Other courts have held these types of claims are suitable for class certification, and this Court should too. *See Corcoran v. CVS Health Corp.*, 779 F. App'x 431 (9th Cir. 2019); *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182 (D.R.I. 2021).

### STATEMENT OF COMMON FACTS AND CLASSWIDE EVIDENCE

I. **THE U&C PRICE ENSURES THAT INSURED CUSTOMERS DO NOT PAY MORE FOR PRESCRIPTION DRUGS THAN CASH CUSTOMERS**

This case involves Kroger's manipulation of its U&C prices and the interplay between insured and cash prescription drug transactions. As Plaintiffs' expert Dr. Kenneth W. Schafermeyer, a Professor Emeritus of Pharmacy Administration at the University of Health Sciences and Pharmacy in St. Louis explains, the retail pharmaceutical industry has long acknowledged only two types of pharmaceutical transactions: (1) transactions involving insured customers; and (2) transactions involving cash customers. Ex. 81 (Schafermeyer Rpt.) ¶¶ 26; Ex. 82 (30(b)(6) Dep.) at 99:9-21 (testifying that if a customer did not use insurance to buy prescription drugs "then that would be a retail cash transaction."). Decades of industry practice establish that the U&C price is understood in the industry to mean the lowest price that a pharmacy would offer to a cash customer (*i.e.*, a customer paying without using insurance), including any discounts offered by the pharmacy. Ex. 81 (Schafermeyer Rpt.) ¶¶ 93-133. Thus, the U&C price operates as a ceiling for prices charged to insured customers for prescription drugs. *Id.* ¶¶ 51-62. That is because "[i]nsurance plans are designed to reduce costs – not make health care more expensive." *Id.* ¶ 27. "Allowing pharmacy customers without insurance to get routinely lower prices than those with insurance would defeat the cost-containment purpose of insurance." *Id.*

3

The percentage of Americans who are enrolled in health insurance plans that cover at least a portion of prescription drugs costs is an all-time high of over 92%.[2]  When insured customers buy drugs at Kroger, Kroger submits the claims for adjudication to a PBM using the industry-wide common data standards promulgated by the National Council for Prescription Drug Programs ("NCPDP").  Ex. 81 (Schafermeyer Rpt.) at ¶¶ 37-49; Ex. 82 (30(b)(6) Dep.) at 109:8-110:07.  The NCPDP standards apply to "all claims submissions to all health plans." *United States ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002, 1013-14 (S.D. Ill. 2014) (citing 45 C.F.R. §162.1102(a)(2)), *aff'd in part & rev'd in part*, 824 F.3d 632 (7th Cir. 2016); Ex. 81 (Schafermeyer Rpt.) at ¶ 45.  To ensure that insured customers do not pay more than cash customers, when submitting claims for adjudication to the appropriate PBM, Kroger's computer system automatically reports the U&C price for a drug using the NCPDP's mandatory code 426-DQ.  Ex. 82 (30(b)(6) Dep.) at 109:17-110:16 (testifying about Kroger's U&C reporting process); Ex. 81 (Schafermeyer Rpt.) at ¶¶ 48-49.  Consumers expect pharmacies to report accurate U&C prices because they are used to ensure that insured customers do not pay more than the price charged to cash-paying customers.  *Id.*, ¶ 58; Ex. 75 (Lewis Dep.) at 97:20-98:03 ("I would expect to pay less" than "[c]ash-paying customers or customers who do not have insurance coverage . . . [b]ecause I pay insurance.  I pay an amount every month to have coverage, where some people don't."); Ex. 74 (Kirkbride Dep.) at 132:21-24 ("Q.  Do you expect to pay less with insurance than somebody who pays the retail price?  A. Yes.").

## II.    KROGER FACED COMPETITIVE PRESSURE ON U&C PRICING

The U&C price is material not only to Plaintiffs and Class members, but also to Kroger's bottom line because there is a direct correlation between higher U&C prices and higher revenues

[2] *See* https://www.hhs.gov/about/news/2023/08/03/new-hhs-report-shows-national-uninsured-rate-reached-all-time-low-2023-after-record-breaking-aca-enrollment-period.html

for Kroger. Ex. 82 (30(b)(6) Dep.) at 188:2-192:18. Because the U&C price is the ceiling that insured customers pay, if Kroger reports a U&C price that is below the rate negotiated for insured customers, it effectively loses the difference. *Id.*

However, most of Kroger's competitors, including CVS, Rite-Aid, Walmart, and Walgreens,[3] threatened Kroger's market share when they began savings club programs that offered cash customers steep discounts on popular prescription drugs. Ex. 81 (Schafermeyer Rpt.) at ¶¶ 65-67; Ex. 82 (30(b)(6) Dep.) at 22:24 ("A: Yeah, pretty much I believe every pharmacy came out with a $4 and $10 program to match Walgreens. CVS, Rite Aid, Walmart. Walmart had the program."). Notably, Walmart, Target and Costco all reported their discount prices as their U&C prices. Ex. 81 (Schafermeyer Rpt.) at ¶¶ 65, 71.

Kroger found itself in a bind. If it reduced cash prices to keep up with competitors, it risked losing revenue because more insured transactions would adjudicate as "U&C hits," but if Kroger failed to reduce its cash prices, it risked losing lucrative cash customers:

> Q:   You had said that one of the purposes of the savings club was for Kroger to increase usage at its pharmacies, right?
>
> A:   Correct.
>
> Q:   Did that objective come in part from competitive pressures that other pharmacies were creating with their discounts or savings programs?
>
> A:   . . . So, yes, to try to gain patient's usage in our pharmacies, yes, the savings club. That's one of the stated goals. . . .

Ex. 82 (30(b)(6) Dep.) at 47:6-48:4; Ex. 4 at 24 (RxSC was designed to increase customer share).

## III.   KROGER ADMITS THAT WHEN IT REPORTED U&C PRICING FOR INSURANCE TRANSACTIONS, IT EXCLUDED SAVINGS CLUB PRICES

On December 9, 2018, Kroger launched the Savings Club to "capture as much market

---

[3] *See* Ex. 77 (Kroger's 8/28/2023 Responses to Interrogatories) at Response Interrogatory No. 9 (identifying Kroger's chief pharmacy competitors).

share [of uninsured customers] as quickly as possible" but without lowering its U&C prices for

insured customers.  Ex. 82 (30(b)(6) Dep.) at 53:3-9.  Though Kroger used the Savings Club to

offer discount prices to cash customers, it failed to report or otherwise include its Savings Club

prices when determining the U&C prices it reported for insurance transactions.  Kroger has

admitted that was also true for transactions involving Caremark and ESI, the two PBMs at issue

here.  Ex. 76 (Def.'s 6/2/2023 Responses to Requests for Admission) at Nos. 1-2.  Kroger further

admitted that, as a result of its policy, "[Savings] Club members enjoy prices so low, they often

beat insurance copays."  Ex. 82 (30(b)(6) Dep.) at 124:21-125:8; Ex. 10.

## IV.    KROGER WAS REQUIRED TO INCLUDE ITS SAVINGS CLUB PRICING WHEN REPORTING U&C PRICES

### A.    Governing Law

Courts have firmly established that the prices used for pharmacy discount programs must

be factored into U&C determinations.  Most notably, in  *U.S. ex rel. Garbe v. Kmart Corp.*, 824

F.3d 632 (7th Cir. 2016), the Seventh Circuit "referenced a variety of sources—dictionary

definitions, regulatory definitions, Medicare policy, caselaw, and a CMS manual—to determine

the boundaries of 'usual and customary price charged to the general public.'"  *United States v.*

*SuperValu Inc.*, 9 F.4th 455, 460 (7th Cir. 2021), vacated and remanded on other grounds sub

nom. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023).  "On those facts," the

court "held that a pharmacy's discount-program prices could be its U&C prices when the

program was offered to the public, even though the discount prices were not the retail prices

charged to all customers."  *Id.*; *Garbe*, 824 F.3d at 645 ("The 'usual and customary' price

requirement should not be frustrated by so flimsy a device as Kmart's 'discount programs.'

Because Kmart offered the terms of its 'discount programs' to the general public and made them

the lowest prices for which its drugs were widely and consistently available, the Kmart

'discount' prices at issue represented the "usual and customary" charges for the drugs.").

Here, *Garbe* and its progeny required Kroger to account for its RxSC prices when reporting its U&C prices.  While the holding in *Garbe* arguably governs all of Kroger's transactions, at a minimum it applies to its Medicare transactions like those at issue in that case. But, even for Medicare transactions, Kroger never reported its Savings Club price as its U&C price.  Ex. 82 (30(b)(6) Dep.) at 123:10-16.  Accordingly, consumers like Plaintiff Kirkbride and the other members of the Ohio Medicare Class were overcharged for the prescription drugs that they purchased using their Medicare coverage.  Ex. 80 (Weir Decl.) ¶¶ 25-26, 29-30.

### B.    Industry Standards

*Garbe* and its progeny establish that prices for discount programs like the RxSC must be considered when determining U&C prices.  Indeed, as set forth in Dr. Schafermeyer's expert report, decades of industry practice establish that the U&C price has consistently been understood in the industry to mean the lowest price that a pharmacy would offer to a cash customer (*i.e.*, a customer paying without using insurance), including any discounts offered by the pharmacy to the cash customer for a specific drug product on a particular day at a particular pharmacy.  Ex. 81 (Schafermeyer Rpt.) ¶ 29.

Based on this understanding, several of Kroger's competitors, including Walmart, Target, and Costco, used the prices for their discount programs as their U&C prices.  *Id.* ¶¶ 65, 71.  Even Kroger uses its RxSC prices for certain Medicaid transactions.  Ex. 82 (30(b)(6) Dep.) at 121:10-15.  As such, Kroger's failure to report or otherwise include its RxSC prices when determining the U&C price to report for its prescription drugs was likely to deceive the reasonable consumer and to unjustly enrich Kroger.  *Forth v. Walgreen Co.*, 2018 WL 1235015, at *5 n.9 (N.D. Ill. Mar. 9, 2018) (recognizing Plaintiffs may rely on expert testimony for "the industry definition of what constitutes 'usual and customary' prices").

### C. Kroger's Contracts With Caremark and ESI

Kroger's contracts with both Caremark and ESI also make it clear that it was required to report Savings Club prices as its U&C prices. The Caremark contract provides the following:

> <u>Usual and Customary Price</u> means the lowest price the Provider would charge to a particular customer if such customer were paying cash for an identical prescription on that particular day. **This price must include any applicable discounts offered to attract customers.**

Ex. 16 at 9 (emphasis added). The ESI contract provides the following:



Ex. 11 at 1.18 (emphasis added); Ex. 14 (ESI Network Provider Manual defining U&C to include "loss leaders," "membership and/or club programs, frequent shopper or special customer discounts or programs," and "any applicable discounts offered to attract customers. . . .").

Notably, when Kroger wants to exclude Savings Club prices from its U&C price calculation, it adds clear exclusionary language in its contracts with PBMs. For instance, Kroger's contract with OptumRx was amended in December 2018 to change the definition of "Usual and Customary Charge" in order ███████████████████████████████████ ██████████████████████████████. Ex. 19. Similarly, Kroger's contract with PBM Navitus Health Solutions contains an addendum that ███████████████████████████████████ the definition of U&C. Ex. 20 at ¶ 1.19. There are no similar exclusions under the Caremark and ESI agreements:

---

[4] Kroger acknowledges that a "cash discount network" in this context refers to third-party discount card like those offered by SingleCare and GoodRx, and does not include the RxSC. Ex. 82 (30(b)(6) Dep.) at 94:15-95:11.

Q.      Are you aware of any documents that expressly excludes the
        Kroger Savings Club prices from the definition of U&C
        under the Caremark contract?[5]

A.      No.

Q.      Are you aware of any document that expressly excludes the
        Kroger Savings Club prices from the definition of U&C
        under the ESI contract?

A.      No.

Ex. 82 (30(b)(6) Dep.) at 192:21-193:7.

## **LEGAL STANDARD**

To obtain class certification, Plaintiffs must first demonstrate that the putative class meets

the requirements of Rule 23(a), "referred to by the shorthand of (1) numerosity, (2) commonality,

(3) typicality, and (4) adequacy." *Hogan v. Cleveland Av. Restaurant, Inc.*, 2023 WL 5745439, at

*5 (S.D. Cal. Sept. 6, 2023) (Marbley, J.) (internal quotation omitted).  Plaintiffs must also show

that the class action falls into at least one of the three categories set forth by Rule 23(b).  *See*

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012).  Rule 23(b)(3)

provides that class certification is appropriate if "the court finds that the questions of law or fact

common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In addition, "the class definition must

be sufficiently definite so that it is administratively feasible for the court to determine whether a

particular individual is a member of the proposed class."  *Young*, 693 F.3d at 537-38 (internal

quotation omitted).  In other words, the proposed class must be ascertainable.

The Court must conduct a "rigorous analysis" to determine whether Plaintiffs have met the

requirements of Rule 23.  *Id.*  In ruling on a motion for class certification, the Court may not

---

[5] All deposition quotations exclude objections.

consider the merits of Plaintiffs' claims, but may consider evidence outside the pleadings to determine whether Plaintiffs have met their burden. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). The Court has broad discretion in determining whether to certify a class. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

## ARGUMENT

## I.     THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)

### A.     The Proposed Classes Satisfy the Numerosity Requirement

Rule 23(a)(1) requires that the "class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(A)(1). A class of forty or more is "[o]ften . . . sufficient to meet the numerosity requirement." *Castillo v. Morales, Inc.*, 302 F.R.D. 480, 487 (S.D. Ohio 2014) (Marbley, J.). Here, numerosity is easily satisfied because each of the proposed Classes contains thousands of members. Ex. 80 (Weir Decl.) ¶ 28.

### B.     Questions of Fact and Law Are Common to the Proposed Class

To satisfy the commonality requirement of Rule 23(a)(2), Plaintiffs must "demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (internal quotation omitted). Plaintiffs need not prove "that all or most class members were in fact injured to meet this requirement." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015). To certify a class, "[t]here need be only one common question." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013) ("*Whirlpool*"). This question, however, must be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 852 (quoting *Dukes*, 564 U.S. at 350). As the Sixth Circuit explained, "named plaintiffs must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that

common answer relates to the actual theory of liability in the case." *Rikos*, 799 F.3d at 505.

Here, the common question that will drive the resolution of this litigation is whether Kroger should have included its RxSC prices when determining the U&C prices to report for insurance transactions. As set forth in the expert report of Dr. Kenneth Schafermeyer, and as demonstrated by the evidence, Kroger's RxSC prices fit within the accepted industry meaning and Kroger's own understanding of U&C prices. And, within each Class, this issue will be determined the same way for all members. Accordingly, commonality is satisfied.

### C. Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." To meet the typicality requirement, the class members' claims must be "fairly encompassed by the named plaintiffs' claims." *Whirlpool*, 722 F.3d at 852. A claim meets this requirement if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082). However, "a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Id.* (internal quotations omitted).

Here, the Plaintiffs' claims and the class members' claims arise from the same factual and legal theory: Kroger overcharged them when it failed to factor in RxSC prices into its U&C prices. Plaintiff Kirkbride is a member of the Ohio Medicare Class and the Ohio Caremark Class. Ex. 80 (Weir Decl.) ¶¶ 29-30. Plaintiff Lewis is a member of the Texas Caremark Class and the Texas Express Scripts class. *Id.* Plaintiffs' interest in seeking monetary relief are identical to those of class members, and so in asserting their own claims, Plaintiffs will necessarily establish the elements of the very same claims for members of the Classes.

11

### D. Plaintiffs and their Counsel Will Fairly and Adequately Represent the Classes

The adequacy requirement "calls for a two-pronged inquiry: (1) the representatives must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Hogan, Inc.*, 2023 WL 5745439, at *16 (internal quotation omitted). "With respect to the first prong, the Court must be satisfied that 'the class members have interests that are not antagonistic to one another.'…With respect to the second prong, the Court must be satisfied that 'class counsel are qualified, experienced and generally able to conduct the litigation.'" *Id.* (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000)) (internal citations omitted).

Here, the named Plaintiffs have both dedicated substantial time to this action, including by reviewing the pleadings, meeting with their attorneys, responding to written discovery requests, collecting and producing documents, and preparing and sitting for a deposition. Ex. 72 (Kirkbride Decl.) ¶ 4; Ex. 73 (Lewis Decl.) ¶ 4. They frequently communicate with their attorneys, not only to discuss discovery or other issues requiring immediate attention, but also to keep abreast of the case generally and significant events in the case. Ex. 72 (Kirkbride Decl.) ¶ 4; Ex. 73 (Lewis Decl.) ¶ 4. They have a basic layperson understanding of the difference between an individual action and a class action. Ex. 72 (Kirkbride Decl.) ¶ 3; Ex. 73 (Lewis Decl.) ¶ 3. They expect to assist further in the case as needed, including testifying at trial. Ex. 72 (Kirkbride Decl.) ¶ 5; Ex. 73 (Lewis Decl.) ¶ 5. Plaintiffs Kirkbride and Lewis have no interests in this litigation that would conflict with class members, or any relationship with counsel that would cause them to put their economic interests above those of the class members they seek to represent. Ex. 72 (Kirkbride Decl.) ¶ 6; Ex. 73 (Lewis Decl.) ¶ 6.

In addition, Bursor & Fisher and Smith Krivoshey are adequate counsel. The attorneys at both firms have worked hard prosecuting this action and have a strong record of litigating class

actions through jury trials and appeal. Since Bursor & Fisher's founding, the firm has won six of

six class action trials. Ex. 78 (B&F Firm Resume). Courts have held that the attorneys at Bursor

& Fisher "are experienced and qualified class action lawyers" who have "been appointed class

counsel in dozens of cases in both federal and state courts, and has won several multi-million

dollar verdicts or recoveries." *Famular v. Whirlpool Corp.* (S.D.N.Y. Mar. 19, 2019) 2019 WL

1254882, at *4; *Melgar v. Zicam, LLC* (E.D. Cal. Oct. 29, 2014) 2014 WL 5486676, at *2

("Bursor & Fisher is a well-established, reputable firm that is up to handling the challenges of

this litigation and is capable of committing the requisite resources to doing so."). The members

of Smith Krivoshey were long-time, trial-experienced partners of Bursor & Fisher who recently

left to establish their own firm. The two firms have a strong working relationship, and Joel

Smith, one of the founders of Smith Krivoshey, has been working on this case since it was first

filed. Ex. 79 (Smith Krivoshey, PC's Firm Resume).

## II.   THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(b)(3)

### A.   Common Factual and Legal Questions Will Predominate Over Any Individual Issues

The predominance requirement turns on whether "questions of law or fact common to

members of the class predominate over any questions that affect only individual members."

*Whirlpool*, 722 F.3d at 860. Generally, in light of the interplay between the requirements of Rule

23(a) and (b), "a finding of commonality will likely satisfy a finding of predomination." *Myers

v. Marietta Mem'l Hosp.*, 2017 WL 3977956, at *8 (S.D. Ohio Sept. 11, 2017).

#### 1.   Fraud

Under Ohio law, the elements of a fraud are:

> (1) a representation or, where there is a duty to disclose, concealment
> of a fact, (2) that is material to the transaction at hand, (3) made
> falsely, with knowledge of its falsity, or with such utter disregard and
> recklessness as to whether it is true or false that knowledge may be

13

> inferred, (4) with the intent of misleading another into relying upon it, (5) with justifiable reliance by the injured party upon the representation or concealment, and (6) resulting injury proximately caused by the reliance.

*Ewalt v. GateHouse Media Ohio Holdings II, Inc.*, 2023 WL 2018775, at *16 (S.D. Ohio Feb. 15, 2023) (Marbley, J.) (citation omitted).  Likewise, under Texas law, the elements for fraud are:

> (1) a material representation was made; (2) it was false when made; (3) the speaker knew it was false, or made it recklessly without knowledge of its truth and as a positive assertion; (4) the speaker made it with the intent that it should be acted upon; and (5) the party acted in reliance and suffered injury as a result.

*Daldav Assocs., L.P. v. Lebor*, 391 F. Supp. 2d 472, 475 (N.D. Tex. 2005).

Here, these elements are all susceptible to classwide proof.  For each transaction at issue, Kroger made a direct representation to Class members about the copayment that they owed, an indirect representation to Class members by reporting inflated U&C prices to PBMs, and an omission by failing disclose or correct the same.  In all instances, these representations and omissions were necessarily material because they had a direct bearing on the amounts that Plaintiffs and Class members paid for their prescription medications.  *Harris Cnty., Texas v. Eli Lilly & Co.*, 2020 WL 5803483, at *16 (S.D. Tex. Sept. 29, 2020) ("[C]ourts have held that the act of publishing artificially inflated prices itself can constitute a fraudulent statement.").

Whether Kroger's representations were false can be decided on a classwide basis because Kroger either inflated its U&C prices (and copayments) across the board or it did not.  Likewise, because Kroger's representations were all part of a common scheme, it either knew that its representations for each transaction were false or it did not know for any of them.  And Kroger's common purpose in making these price representations were the same for every transaction as well: Kroger intended consumers to rely on the higher quoted prices and U&C prices, and therefore pay higher copayments, in order to acquire higher profits.

14

Finally, in light of the nature of the allegations, classwide reliance can be presumed. "Whether class reliance may be presumed in a particular case does not appear to depend on any clear rules but on common-sense judgments about its appropriateness." *Hale v. Enerco Group*, 288 F.R.D. 139, 148 (N.D. Ohio Dec. 29, 2012). Reliance may also "be susceptible to class-wide proof where 'there is an obvious link between the alleged misconduct and harm.'" *Id.* The Sixth Circuit has held that a presumption of reliance is particularly well-suited to the consumer fraud context. Surveying multiple states' laws, the Court of Appeals in *Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) held:

> Plaintiffs can prove causation and/or reliance on a classwide basis
> provided that (1) the alleged misrepresentation . . . is material or
> likely to deceive a reasonable consumer, and (2) [defendant] made
> that misrepresentation in a generally uniform way to the entire class.

*Id.* at 518. For material omissions, a presumption of reliance is even more straightforward. "When there is nondisclosure of a material fact, courts permit inferences or presumptions of inducement and reliance. Thus, cases involving common omissions across the entire class are generally certified as class actions, notwithstanding the need for each class member to prove these elements." *Cope v. Metro. Life Ins. Co.*, 82 Ohio St. 3d 426, 436 (1998).

Here, a presumption of reliance is warranted because common sense dictates that there is a direct link between Kroger uniformly misrepresenting and omitting its U&C prices and class members paying inflated prices. Consumers paid the overcharges because that is what Kroger told them they were required to pay. Courts have held in "cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013). "Fraud claims of this type may thus be appropriate candidates for class certification because 'while each plaintiff

15

must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue).'" *Id.* (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004)).

### 2. Unjust Enrichment

"Courts routinely certify classes based on claims of unjust enrichment . . . ." *Youngblood v. Linebarger Googan Blair & Sampson, LLP*, 2012 WL 4597990, at *8 (W.D. Tenn. Sept. 30, 2012); *Pfaff v. Whole Foods Mkt. Grp. Inc.*, 2010 WL 3834240 (N.D. Ohio Sept. 29, 2010) (certifying unjust enrichment claims); *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 925 (10th Cir. 2018) (affirming certification of an unjust enrichment class, and noting that "unjustness presents a common question here because the class members seek to establish this element through shared circumstances susceptible to class-wide proof"); *Fenley v. Wood Grp. Mustang, Inc.*, 325 F.R.D. 232, 252 n.8 (S.D. Ohio 2018) (rejecting defendant's contention that claims for unjust enrichment are "inherently unsuitable for class certification").

Here, under Ohio law, the elements of unjust enrichment are: "(1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Horsemen's Benevolent & Protective Ass'n v. Belterra Park*, 2023 WL 2712395, at *10 (S.D. Ohio Mar. 30, 2023) (Marbley, J.).  Plaintiff Kirkbride's unjust enrichment claim and those of members of the Ohio Medicare Class and the Ohio Caremark Class will rise or fall together.  All members of those Classes conferred a benefit on Kroger when they paid for their prescription medications, and Kroger plainly knew about those payments.  Whether those payments contained improper overcharges because they were based on inflated U&C prices that did not factor in Kroger's RxSC prices is a question for the merits, but the answer will be the same across all members of the Classes.  Whether based on *Garbe*, industry standards or

contractual language, the question of whether there were overcharges will be answered the same way across the board. And if Kroger did overcharge members of these Classes, it is unjust in every instance for it to retain the amount of that overcharge.

Likewise, under Texas law, "[u]njust enrichment occurs when the 'person sought to be charged [has] wrongfully secured a benefit or [has] passively received one which it would [be] unconscionable to retain.'" *Johnson v. Maund Auto. Grp., L.P.*, 2004 WL 1792400, at *3 (Tex. App. Aug. 12, 2004) (quoting *City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex.App.-Corpus Christi 1987)); *id.* ("Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits.").[6] The same analysis for the Ohio unjust enrichment claim applies here. In failing to account for its RxSC prices when reporting its U&C prices, Kroger either wrongfully secured a benefit or it did not. And that retention was either unconscionable or it was not. Regardless of how those questions are answered, the answer will be the same for all members of the Texas Caremark and Texas Express Scripts Classes.

### 3. Negligent Misrepresentation

Under Texas law, the elements for a claim of negligent misrepresentation are:

> (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). No special relationship is required, including for non-disclosures where there is a duty to correct. *Correct Rx Pharmacy Servs., Inc. v. Cornerstone Automation Sys., LLC*, 2018 WL 4680568, at *2 n.5

---

[6] As the Court previously noted, some Texas courts recast claims for unjust enrichment as claims for "money had a received." MTD Order (ECF No. 42) at 13.

(N.D. Tex. Sept. 28, 2018); MTD Order at 14.

Here, Plaintiff Lewis will prove her claim for negligent misrepresentation based on common evidence and that claim can be resolved classwide. All of the direct and indirect representations and omissions at issue were made in the course of Kroger's business. The information that Kroger supplied (its U&C prices and copayment quotes) was either false across the board or it was not. And whether Kroger used reasonable care in making those representations and omissions does not differ from transaction to transaction because Kroger made them in the course of a common scheme. Finally, all class members suffered a pecuniary loss because the class is limited to instances in which consumers paid more than the U&C price.

### B.    Plaintiffs Have A Method For Calculating Damages on a Classwide Basis

To satisfy the predominance and superiority inquiries, classwide damages must be calculable through the application of a common methodology. *Hurt v. Commerce Energy, Inc.*, 2015 WL 1298674, at *2 (N.D. Ohio Mar. 23, 2015) ("[A]lthough the damages would be unique for each class member, they would all be determined by applying a consistent methodology."). "A plaintiff need not calculate a specific damage figure so long as he proposes an acceptable method for calculating damages." *Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 791 (6th Cir. 2005); *see also In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355, at *67 (N.D. Ohio Nov. 17, 2014) (collecting cases allowing certification where Plaintiff has identified a damages methodology that can be applied to each class member.). "[I]ndividual damages calculations do not preclude class certification under Rule 23(b)(3)." *Compound Prop. Mgmt. LLC v. Build Realty, Inc.*, 2023 WL 2140981, at *24 (S.D. Ohio Feb. 21, 2023) (quoting *In re Whirlpool*, 722 F.3d at 850); *Eaton v. Ascent Res. – Utica, LLC*, 2021 WL 3398975, at *13 (S.D. Ohio Aug. 4, 2021) ("The issue of individualized damages amounts does not risk predomination because this Court may bifurcate the issues of liability and damages if that proves to be the appropriate

course.").

Here, Plaintiff's damage expert, Colin B. Weir, has explained how classwide damages in this case can be calculated using Kroger's own records.  Ex. 80 (Weir Decl.) ¶¶ 14-27.  The formula for this damages calculation is straightforward: Price Paid by Class Member – U&C Price = Damages.  *Id.* ¶ 22.  The price paid by each Class Member is found in Kroger's transactional records.  The U&C Price, which refers to the RxSC price charged for that same prescription and quantity, can be determined from Kroger's RxSC formulary (for tiered medications) and its transactional records (for non-tiered medications).  *Id.* ¶¶ 9-20. Accordingly, Plaintiffs will be able to calculate classwide damages.

### C.      A Class Action is Superior to Thousands of Individual Lawsuits

For a class to be certified, the class method must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) lists four factors to be considered: (1) the interests of the members of the class in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in management of the class action.  *Id.*  Here, all of these factors weigh in favor of class certification.  No absent class members have demonstrated any interest in controlling this litigation or filing individual cases.  Indeed, there are no known cases involving the allegations at issue in this case.  Litigating this case as a single class action is preferable and far more efficient than tens of thousands of individual actions.  And there are no anticipated difficulties in managing this litigation as a class action.

### D.      The Proposed Class Is Ascertainable

The concept of "ascertainability" as it pertains to class actions "goes to whether the class

has been defined such that it encompasses an identifiable group." *Cerdant, Inc. v. DHL Express (USA). Inc.*, 2010 WL 3397501, *5 (S.D. Ohio Aug. 25, 2010). For a class to be ascertainable, "the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young*, 693 F.3d at 538. The Court need not deny class certification due to the need to review individual files. *Id.* at 540. Otherwise, "defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained." *Id.* (internal quotation omitted). Indeed, as the Sixth Circuit has held,

> It is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies.

*Id.*

Here, each of the Classes is defined by objective criteria and encompasses an identifiable group. Kroger's transactional data shows whether a transaction involved Medicare, Caremark or ESI. That data also shows what Kroger's RxSC price as and how much each customer was actually charged as a copayment. Where the copayment exceeds the RxSC, and Medicare, Caremark or ESI was involved, the consumer is a class member.

## CONCLUSION

For the foregoing reasons, the Court should certify the Classes, appoint Plaintiffs Kirkbride and Lewis and class representative and appoint Bursor & Fisher and Smith Krivoshey as co-class counsel.

DATED: February 26, 2024                    Respectfully submitted,

/s/ Scott D. Simpkins

Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA &
GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile:  (216) 771-1632
sdsimp@climacolaw.com

Joshua D. Arisohn (admitted *pro hac vice*)
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Fl.
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: jarisohn@bursor.com

Joel D. Smith (admitted *pro hac vice*)
**SMITH KRIVOSHEY, P.C.**
867 Boylston Street
5th Floor, #1520
Boston, MA 02116
Tel: 617-377-7404
E-mail: joel@skclassactions.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

This certifies that all counsel of record were served via the Electronic Case Filing

("ECF") System on February 26, 2024.

*/s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)