**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JUDY KIRKBRIDE and BEETA LEWIS, individually and on behalf of all others similarly situated, | : <br> : <br> : <br> : **Case No. 2:21-cv-00022** |
| Plaintiffs, | : |
| | : **JUDGE ALGENON L. MARBLEY** |
| v. | : **Magistrate Judge Elizabeth P. Deavers** |
| | : |
| THE KROGER CO., | : |
| | : |
| Defendant. | : |

## OPINION & ORDER[1]

This matter comes before this Court on Plaintiffs' Motion for Class Certification (ECF No. 76); Defendant's *Daubert* motions to exclude Colin Weir's expert report (ECF No. 94), Susan Hayes' Expert report (ECF No. 110), and Colin Weir's rebuttal report (ECF No. 111); Defendant's motion for leave to file a sur-reply in opposition to Plaintiffs' motion for class certification (ECF No. 112); and Defendant's motion to file its sur-rebuttal expert report under seal (ECF No. 113).

For the reasons stated on the record at the March 13, 2025 status conference, Defendant's motion for leave to file a sur-reply (ECF No. 112) and motion to seal its sur-rebuttal expert report (ECF No. 113) are **GRANTED**. For the reasons stated below, Defendant's motions to exclude (ECF Nos. 94, 110, 111) are **DENIED**; and Plaintiffs' Motion for Class Certification (ECF No. 76) is **GRANTED**.

---

[1] This Opinion and Order ("O&O") was originally filed under seal. (ECF No. 142). The parties were given an opportunity to object to any portion of the O&O that should be redacted to protect sensitive or proprietary information. (ECF No. 142). On April 8, 2025, the parties informed this Court that the O&O may be filed publicly without any redactions. The O&O has since been amended to: (1) provide citations to the official hearing transcripts (ECF Nos. 144, 145, 146) that were previously unavailable; (2) revise this footnote; and (3) omit the portion of the Conclusion that directed the parties to request redactions. When referencing the official transcripts, this Court cites to the pages on the transcripts themselves, rather than the pagination generated by the electronic docketing system. When referencing any other docket entries, the O&O relies on the public versions of the parties' filings and the pagination generated by the electronic docketing system.

I.    **BACKGROUND** .................................................................................................... 3

   A.   The Prescription Drug Network ............................................................................. 3

   B.   Regulatory Scheme ................................................................................................ 6

   C.   Kroger's Rx Savings Club ..................................................................................... 6

   D.   Procedural History ................................................................................................. 7

II.   **STANDARD OF REVIEW** ................................................................................. 10

   A.   Expert Testimony ................................................................................................ 10

   B.   Class Certification ............................................................................................... 11

III.  **LAW AND ANALYSIS** ...................................................................................... 13

   A.   Motions to Exclude Expert Testimony (ECF Nos. 94, 110, 111) ...................... 13

     1.   Motions to Exclude Colin Weir's Testimony (ECF Nos. 94, 111) ................. 13

     2.   Motion to Exclude Susan Hayes' Testimony (ECF No. 110) .......................... 18

   B.   Motion for Class Certification ............................................................................. 20

     1.   Rule 23(a) Requirements ................................................................................. 21

       a.   Numerosity .................................................................................................. 21

       b.   Commonality ............................................................................................... 22

         (1)   Fraud .................................................................................................... 22

         (2)   Unjust Enrichment ............................................................................... 32

         (3)   Negligent Misrepresentation ................................................................ 33

       c.   Typicality .................................................................................................... 34

       d.   Adequacy of Representation ....................................................................... 36

     2.   Rule 23(b) Requirements ................................................................................. 41

       a.   Predominance .............................................................................................. 41

       b.   Superiority ................................................................................................... 48

       c.   Ascertainability .......................................................................................... 49

IV.   **CONCLUSION** .................................................................................................. 52

## I.     BACKGROUND

Named Plaintiffs Judy Kirkbride and Beeta Lewis are consumers in Ohio and Texas that purchased prescription drugs from The Kroger Company ("Kroger") in the last several years.[2] They allege that Kroger, through a deceptive pricing scheme, overcharged them for prescription drugs by misreporting the "usual and customary" (U&C) prices for Plaintiffs' medications, which resulted in higher copayments. Specifically, Plaintiffs contend that Kroger's U&C prices should have reflected the prices offered to cash-paying customers who were enrolled in Kroger's Rx Savings Club—a program that offers discounts to uninsured, cash customers who pay an annual membership fee. Named Plaintiffs seek to hold Kroger liable for fraud and unjust enrichment under Ohio and Texas law, and negligent misrepresentation under Texas law. Before reciting the factual background and procedural history, this Court begins by identifying the relevant entities involved in the drug prescription transaction network and canvassing the regulatory scheme under Medicare Part D.

### A.  The Prescription Drug Network

There are three major sources of payment for prescription drugs in the United States: (1) private (i.e., commercial) third-party payors ("TPPs"); (2) public TPPs (e.g., Medicaid, Medicare, Federal Employees Health Benefits Program, and TRICARE); and (3) cash-paying (or private-pay) customers. (*See* Expert Report of Dr. Kenneth W. Schafermeyer [hereinafter Schafermeyer Report], ECF No. 76-18 ¶ 34 (SEALED)).

---

[2] Specifically, from 2018 to approximately August 2020, Kirkbride was on an Aetna employer-based plan, with Caremark as the PBM. (Amended Expert Report of Jed Smith, ECF No. 92-9 ¶ 27). From approximately late 2020 through the end of 2023, Kirkbride was on an Anthem MediBlue Preferred Plus plan, a Medicare plan with Caremark serving as the PBM. Beeta Lewis likewise purchased drug prescriptions from Kroger through a plan with Caremark as a PBM.

For individuals who are insured, it begins with the TPP, which offers beneficiaries prescription drug coverage through health plans. (Expert Report of Michael Jacobs [hereinafter Jacobs Report], ECF No. 92-1 ¶¶ 18, 19, 25, 27, 28). Many plans have formularies that place drugs into preferred and non-preferred tiers, with each tier consisting of drugs at a different cost level. (*See* Expert Report of Dr. James Hughes [hereinafter Hughes Report], ECF No. 92-13 ¶ 25 n. 18). These tiers "generally encourage patients to purchase the drugs in the preferred tiers [e.g., generic drugs] by setting lower copayments or coinsurance amounts for drugs in those tiers." (*Id.*; *see also* Class Cert. Evid. Hr'g & Oral Arg. Tr. ("Hr'g Tr.") vol. II, 270:20–271:20, March 20, 2025, ECF No. 145 (Hughes Test.) (explaining that "fixed copayments or fixed coinsurances are often employed as a way of lowering the cost of the prescription plan to the health plan" by "incentivizing . . . the patient" who was prescribed an expensive brand name medication to ask the doctor for a cheaper alternative, like a generic, that is on the plan's lower or preferred-tier; and noting that fixed payments are "there to incentivize the consumer to in effect make better health care choices")). To facilitate the administration of drug prescription benefits, TPPs usually contract with intermediary organizations known as pharmacy benefit managers ("PBMs"), like Caremark or Express Scripts, who in turn contract with pharmacies (like Kroger), to dispense medications in an efficient manner. (Hughes Report, ECF No. 92-13, ¶¶ 25, 27, 29-31).

Here's how it works. An insured customer goes to fill a prescription at a Kroger pharmacy. She begins by presenting an insurance card with identifying information to the pharmacist. (*Id.* ¶¶ 18, 25). The Kroger pharmacist then inputs several pieces of information into a computer: (1) information on the customer's insurance card, like the Bank Identification Number ("BIN"), Process Control Number ("PCN"), the group number that identifies the customer's plan, and the member ID that identifies that person as a member of the plan; and (2) the prescription information, like the drug information, quantity, and strength. (*See* Hr'g Tr. vol. II, at 262–63, March 20, 2025,

ECF No. 145 (Hughes Test.); *see also* Jacobs Report ¶¶ 15 – 20; Am. Expert Report of Jed Smith [hereinafter Smith Report], ECF No. 92-9 ¶¶ 28–31; Dep. of Jeffrey Steckman 108:4 –111:24, Ex. 82 to Pls.' Mot. for Class Cert. [hereinafter Steckman Dep.], ECF No. 76-19 at 20–24). One of the fields that Kroger also fills out is the U&C price, identified as field 426DQ by the National Council for Prescription Drug Programs ("NCPDP"). (*See* Steckman Dep. 108:21-112:24, ECF No. 76-19 at 20–24).

That information is then sent from Kroger to an automated third-party processor, or what is called a "switch," that takes all these data points, places them in the correct format, and, based on the BIN and PCN numbers, routes the prescription to the PBM that is handling the pharmacy benefit for that particular plan. (*See* Hr'g Tr. vol. II, at 263, March 20, 2025, ECF No. 145 (Hughes Test.); Smith Report, ECF No. 92-9 ¶ 30; *see also* Schafermeyer Report, ECF No. 76-18 ¶ 153 n. 108 (SEALED)).

The PBM will take that information, and "the first thing" it will do is "check and make sure that the individual has coverage under the plan." (Hr'g Tr. vol. II, at 263, March 20, 2025, ECF No. 145 (Hughes Test.)). Based on the extent of coverage, the PBM will then determine whether there's a deductible, if the deductible has been met, whether there is an out of pocket maximum, and if that out-of-pocket maximum has been met. (*Id.*) Crucially, the PBM processing system will "also check the payment formula" that applies to determine the patient's cost-sharing amount. (*Id.* at 263–64). This determination is often based on the plan's drug formulary, discussed above. Depending on which "tier" the drug is on, and the copayment or coinsurance amount that goes with that tier, the PBM calculates the customer's cost-sharing amount. This may take the form of a (1) copayment, a specified dollar amount charged to patients each time they receive a prescription (e.g., $10 per prescription); (2) deductible, a specified amount that patients are required to cover out-of-pocket for certain services before insurance coverage becomes effective (e.g., the first $500

of prescription costs); or (3) coinsurance, a specified percentage of prescription costs charged to patients each time they receive a prescription (e.g., 20% of the "usual and customary" price). (Schafermeyer Report, ECF No. 76-18 ¶ 26 n. 6). The PBM will make its calculations based on all this information and, almost instantaneously, relay back to Kroger how much to charge the customer. (Hughes Report, ECF No. 92-13 ¶ 30).

### B. Regulatory Scheme

Another way a customer pays for drug prescriptions is through public health programs like Medicare and Medicaid, which are administered by the Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). The Medicare Act provides federally funded health-insurance coverage to individuals who are age 65 or older or are disabled. 42 U.S.C.A. § 1395 (West), *et seq*. Under Medicare Part D, CMS enters contracts with private insurers, or "plan sponsors," to provide prescription drug coverage to beneficiaries. 42 U.S.C.A. § 1395w-101 *et seq*.; 42 C.F.R. §§ 423.30, 423.32. Plan sponsors are paid by CMS on an ongoing basis and CMS, at the end of the year, reconciles those payments with the sponsor's actual costs. *See* 42 C.F.R. §§ 423.315, 423.329, 423.343. Like commercial TPPs, plan sponsors can contract with PBMs to administer prescription drug benefits for Medicare Part D beneficiaries which, in turn, can contract with pharmacies to facilitate access to these benefits. Medicaid operates similarly but leverages the cooperative efforts of the states. 42 U.S.C. § 1396 *et seq*. States may offer outpatient prescription-drug coverage as part of a Medicaid plan. 42 U.S.C. 1396d(a)(12).

### C. Kroger's Rx Savings Club

Of course, not all customers need be insured to purchase drug prescriptions. Since 2018, Kroger has offered an "Rx Savings Club," a discount program for non-insured, self-paying or cash customers who pay an annual membership fee ($36 for individuals and $72 for families) in

exchange for discounts for over 100 generic prescription drugs priced at three "tiers" ($0, $3/$6 for a 30-/90-day supply, and $6/$12 for a 30-/90-day supply) and "up to 85% off thousands of additional brand-name and generic medications." (Expert Report of Dr. Kelly Nordby [hereinafter Nordby Report], ECF No. 92-17 ¶¶ 22, 23).

Named Plaintiffs Judy Kirkbride and Beeta Lewis contend that, for insured customers like themselves, Kroger failed to report their Savings Club as the "usual and customary" prices that Kroger reported to PBMs, resulting in higher cost-sharing amounts for Plaintiffs. (*See generally*, ECF No. 30). Plaintiffs allege that they paid these inflated copayments "with the understanding that the U&C [usual and customary] price that Kroger reported . . . were the actual U&C prices paid by cash-paying customers, and that the copayments that Kroger charged [Plaintiff] were based on an accurate U&C [price]." (*Id.*). Plaintiffs also contend that they "would not have paid the inflated copayments but for Kroger's wrongful conduct." (*Id.*). "Put another way, the gravamen of this action . . . is that, contrary to industry standards, Kroger deceived Plaintiffs and class members by reporting U&C prices above the prices available to members of the [Savings Club] program . . . and then charging Plaintiffs and class members inflated copayments." (*Id.* ¶ 2).

### D. Procedural History

On January 5, 2021, Plaintiff Judy Kirkbride, an Ohio resident who filled her prescriptions at a Kroger pharmacy in Hebron, OH using her insurance coverage through Aetna and Medicare plans filed a putative class action on behalf of all persons in the United States and Ohio "who paid for, in full or in part, a prescription generic drug that Kroger included in its Rx Savings Club, and who were insured for the purchase through a third-party payor." (ECF No. 1).

On April 29, 2021, Plaintiff amended her complaint to name four additional plaintiffs: (1) Patricia Berger, an Ohio resident, who has filled prescriptions at a Kroger pharmacy in Newark, OH using her Medicare Part D prescription drug insurance plans from Express Scripts and

Anthem; (2) Plaintiff Lester Hatfield, who has filled prescriptions at a Kroger pharmacy in Columbus, OH using his Medicare Part D prescription drug insurance plans from Human and Express Scripts; (3) Melody Mackert, a Texas resident who has filled prescriptions at a Kroger pharmacy in Humble, TX using her insurance coverage through Navitus Health Solutions; and (4) Plaintiff Beeta Lewis, a Texas resident who has filled prescriptions at a Kroger pharmacy in Arlington, Texas using her insurance coverage through Cigna and Oscar. (*See* ECF No. 30 ¶¶ 4–8). The amended complaint asserts claims of fraud (under Ohio and Texas law), negligent misrepresentation (under Texas law), and unjust enrichment (under Ohio and Texas law).

On September 6, 2022, Plaintiffs stipulated to the voluntary dismissal of Plaintiff Hatfield's claims against Kroger, which this Court construed as a motion to sever pursuant to Rule 21 and granted. (ECF Nos. 50–51). On September 11, 2023, Plaintiffs likewise moved to dismiss without prejudice Plaintiff Mackert's claims, which this Court also granted. (ECF Nos. 63, 65). On January 2, 2024, Plaintiffs moved to dismiss without prejudice Plaintiff Berger's claims, which this Court granted. (ECF Nos. 67, 68).

On February 26, 2024, remaining plaintiffs Judy Kirkbride and Beeta Lewis filed their motion for class certification. (ECF No. 76). Plaintiffs originally proposed the following four subclasses where insured customers paid an amount more than the Savings Club price: (i) a class of Ohio customers who purchased prescription drugs using Medicare supplement insurance; (ii) a class of Ohio customers who purchased prescription drugs using insurance through the PBM Caremark, LLC ("Caremark"); (iii) a class of Texas customers who purchased prescription drugs using insurance through the PBM Caremark; and (iv) a class of Texas customers who purchased a prescription drug using insurance through the PBM Express Scripts, Inc. ("Express Scripts").[3]

---

[3] In their reply in support of the motion for class certification, however, Plaintiffs withdrew their request to certify a Texas Express Scripts Class. (ECF No. 105).

In support of class certification, Plaintiffs submitted expert reports by Colin Weir, President at "Economics and Technology, Inc.", a research and consulting firm specializing in economics, statistics, regulation and public policy in Boston; and Dr. Kenneth W. Schafermeyer, Professor Emeritus of Pharmacy Administration at the University of Health Sciences and Pharmacy in St. Louis. Mr. Weir's report seeks to explain how members of the Ohio Medicare Class were overcharged for the prescription drugs purchased using Medicare coverage and how class-wide damages in this case can be calculated using Kroger's own records. Dr. Schafermeyer's expert report, on the other hand, discusses the industry practice regarding U&C determinations and opines that Kroger's interpretation of the U&C price to exclude its Savings Club discounts is inconsistent with industry practice and applicable regulations and government guidance.

Kroger opposed the Motion for Class Certification (ECF No. 92), and further moved to exclude Dr. Schafermeyer and Mr. Weir's expert testimony (ECF Nos. 93, 94). Opposing the motions to exclude (ECF Nos. 98, 99), Plaintiffs attached additional reports and exhibits, including a rebuttal expert report by Dr. Susan A. Hayes, LPD, CPhT., AHFI, Principal, owner, and founder of Pharmacy Investigators and Consultants. (ECF No. 99-5). In their reply in support of the motion to exclude Dr. Shafermeyer's report (ECF No. 109), Kroger requested that this Court deny the motion without prejudice, which this Court granted. (ECF No. 128 at 2 n. 2).

In their reply in support of their Motion for Class Certification, Plaintiffs included among their exhibits, a 38-page reply declaration by Mr. Weir. (ECF No. 105). Kroger moved to exclude the Hayes rebuttal expert report (ECF No. 110) and Mr. Weir's rebuttal declaration (ECF No. 111). Kroger also sought leave to file a sur-reply in opposition to class certification (ECF No. 112), along with a proposed sur-reply expert report by Jed Smith, a licensed Certified Public Accountant (CPA) in the State of California with "over 15 years of experience calculating damages in healthcare disputes involving pharmacies, Pharmacy Benefit Managers ("PBMs"), payers, and

providers." (ECF No. 112-3 at 4). Plaintiffs opposed the motion for a sur-reply (ECF No. 117), and Kroger replied (ECF No. 120).

After briefing on Plaintiff's Motion for Class Certification and Defendant's motions to exclude concluded, this Court scheduled a three-day evidentiary hearing and oral argument on Plaintiff's Motion for Class Certification, to begin on March 19, 2025. (ECF No. 121). On March 13, 2025, this Court held a telephonic status conference during which it orally granted Defendant's motion for leave to file a sur-reply and Mr. Smith's sur-rebuttal report (ECF No. 112). Between March 19, 2025 and March 21, 2025, this Court held an evidentiary hearing and heard oral argument on Plaintiffs' motion for class certification and Defendants' motions to exclude.

## II.      STANDARD OF REVIEW

### A. Expert Testimony

The district court has broad discretion to determine whether to admit or exclude expert testimony. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). Rule 702, which governs the admissibility of expert testimony, provides that if a court finds that "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and if the witness "is qualified as an expert by knowledge, skill, experience, training, or education," then the witness may testify as an expert so long as the "testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and the witness has "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

The Supreme Court has identified several non-exclusive factors to guide a court's reliability analysis under Rule 702: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; and (4) whether the technique enjoys

general acceptance within the relevant scientific, technical, or other specialized community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). While instructive, these factors "do not constitute 'a definitive checklist or test'" and do not apply in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 593). "The fundamental objective when considering the admissibility of 'expert' testimony is 'to ensure the reliability and relevancy' of that testimony." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (quoting *Kumho Tire Co.*, 526 U.S. at 152). As "gatekeeper," the trial judge is "imbued with discretion in determining whether or not a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007).

When it comes to challenged expert testimony at the class certification stage, the Sixth Circuit has recently instructed that "[i]f challenged expert testimony is material to a class certification motion, the district court must demonstrate the expert's credibility under *Daubert*." *In re Nissan,* 122 F.4th at 253. This is because the Supreme Court requires parties to "satisfy through evidentiary proof" that they "in fact" meet the elements in Rule 23, and insufficiently reliable expert testimony "cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact' through acceptable evidentiary proof." *Id.* (citations and internal quotation marks omitted). The party seeking to introduce the expert testimony must demonstrate its admissibility under Rule 702 by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10.

### B. Class Certification

Class certification is appropriate if the court finds, after conducting a "rigorous analysis," that the requirements of Rule 23 have been met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *In re Nissan*, 122 F.4th at 246 (citing *Dukes*, 564 U.S. at 351–52; *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). As the Sixth Circuit recently emphasized, plaintiffs seeking

class certification "must 'affirmatively demonstrate' the four threshold imperatives of certification" in Rule 23(a): numerosity, commonality, typicality, and adequacy. *See In re Nissan*, 122 F.4th at 246 (quoting *Dukes*, 564 U.S. at 350). Plaintiffs must also show that the proposed class satisfies one of the types of class actions permitted under Rule 23(b): (1) actions where separate lawsuits would risk inconsistent verdicts or impede third-party interests; (2) actions where injunctive or declaratory relief is appropriate; or (3) actions where common questions predominate over issues affecting individual plaintiffs. *Id.* (citing Fed. R. Civ. P. 23(b)(1)–(3); *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 945–46 (6th Cir. 2011)).

In addition, although not expressly required by Rule 23, the proposed class must satisfy an implied ascertainability requirement, which requires the "class description [to be] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *See Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016); *see also Bowles v. Sabree*, 121 F.4th 539, 550 (6th Cir. 2024) ("Class actions come with an 'implied requirement' of ascertainability ('that the putative class members can be readily identified based on the class definition')." (quoting *Tarrify Properties, LLC v. Cuyahoga Cnty., Ohio*, 37 F.4th 1101, 1106 (6th Cir. 2022)).

Inquiry into the merits of the plaintiffs' claims at the class certification stage is limited:  a court may consider merits questions "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013).  But where appropriate, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982), and "rigorous analysis" may involve some overlap between the proof necessary for class certification

and the proof required to establish the merits of the plaintiffs' underlying claims." *Dukes*, 564 U.S. at 350–51.

### III.    LAW AND ANALYSIS

Because the "challenged expert testimony [here] is material to [the] class certification motion," this Court will first consider whether "the expert's credibility [passes muster] under *Daubert*," before turning to whether Plaintiffs have satisfied their evidentiary burden to certify their proposed classes under Rule 23. *See In re Nissan N. Am. Litig.*, 122 F.4th at 253.

### A.  Motions to Exclude Expert Testimony (ECF Nos. 94, 110, 111)

*1.  Motions to Exclude Colin Weir's Testimony (ECF Nos. 94, 111)*

Colin B. Weir is President at Economics and Technology, Inc., a research and consulting firm specializing in economics, statistics, regulation and public policy. (ECF No. 76-17 at 3). He conducts economic, statistical, and regulatory research and analysis and often testifies as an expert witness before state and federal courts. (*Id.* at 13). His experience includes work on a variety of issues, including: "calculating economic harm and damage, and analyzing liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets." (*Id.*). Here, Plaintiffs offer Mr. Weir as a damages expert primarily to "explain[] how classwide damages in this case can be calculated using Kroger's own records." (ECF No. 76 at 27). Specifically, Mr. Weir proposes the following damages formula:

$$| \text{Price Paid by Class Member} - \text{U\&C Price} = \text{Damages} |$$

(Expert Report of Colin B. Weir [hereinafter Weir Report], ECF No. 76-17 ¶ 22). The "price paid by Class Member," according to Weir, is found in Kroger's transactional records—a dataset of over 158 million pharmacy transactions of generic prescriptions that occurred between December

13

1, 2018 and November 30, 2022, in Ohio and Texas, with 38 variables describing each transaction. (*Id.* ¶ 9). As for the U&C Price, Weir was asked to assume that it would be reflective of the Savings Club price, and proceeded to use Kroger's Savings Club price lists (for tiered medications) and Kroger's transactional records (for non-tiered medications) to determine the figure. (*Id.* ¶¶ 9-20).

Kroger argues that Mr. Weir's analysis "does not meet the requirements of Rule 702" because: (1) Weir lacks the "specialized knowledge" to answer the specific questions at issue: whether class members can be identified by certain BINs and classwide damages determined via a formula using only pricing lists and pharmacy claims data, (ECF No. 94 at 7–8); (2) the formula Weir opines can calculate damages on a classwide basis comes directly from counsel, (*id.* at 11); and (3) the "simplified methodology" proposed by Weir "ignores the complex set of payment steps that occur with each pharmacy transaction between TPPs, PBMs, pharmacies, and individual customers." (*Id.* at 13).

Kroger has failed to demonstrate that Mr. Weir's testimony is inadmissible under Rule 702 and *Daubert*. Its first argument—that Weir lacks experience in the pharmaceutical industry to offer an admissible expert opinion on damages in this case—is foreclosed by Sixth Circuit precedent because a generally experienced expert's "unfamiliarity with some specific aspects of the subject at hand merely affect[s] the weight and credibility of [the] testimony, not its admissibility." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir.2007) (internal quotation marks omitted); *see also Barreto*, 268 F.3d at 333. Under Rule 702, "a proffering party can qualify their expert with reference to his 'knowledge, skill, experience, training or education.'" *Surles*, 474 F.3d at 293 (quoting Fed. R. Evid. 702). So long as the background and general experience of the expert leaves the expert "well-positioned" to assist the jury, "[i]t is of little consequence to questions of admissibility that [the expert] lack[s] expertise in the very specialized area." *Id*. at 294.

In *Dilts*, for example, the defendant argued that a plaintiff's accident reconstruction expert should be excluded because the proposed expert had "never worked on cases involving the operation of a crane nor has he specifically reviewed accident reconstruction with respect to the rigging or lifting of materials." *Dilts v. United Grp. Servs., LLC*, 500 Fed. App'x. 440, 445 (6th Cir.2012), *cert. denied sub nom. Maxim Crane Works, L.P. v. Dilts*, 569 U.S. 957 (2013). Rejecting the challenge, the Sixth Circuit held that "[a]n expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact." *Id*. at 445 (citing *Surles*, 474 F.3d at 293–94).

As the Sixth Circuit explained, *Daubert* and Federal Rule of Evidence 702 "require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts on the case at hand." *Id*. There is no requirement that an expert witness "know the answer to all the questions a case presents—even to the most fundamental questions." *Id*. (citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000)); *see also Pineda v. Ford Motor Corp.*, 520 F.3d 237, 244 (3d Cir. 2008) ("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization the court considers most appropriate." (internal quotation marks omitted)).

Kroger's second argument, that Weir's methodology is unreliable because it relied on assumptions from Plaintiffs' counsel, likewise misses the mark. To determine whether expert testimony is relevant and reliable requires a "preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002). While an expert opinion must not rest purely on speculation, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010), "Rule 702 does not

require an expert to have absolute certainty in formulating his opinion," *Dilts*, 500 Fed. Appx. at 445. Rather, "experts are permitted wide latitude in their opinions, *including those not based on firsthand knowledge*, so long as the 'expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Id.* (emphasis added) (quoting *Jahn,* 233 F.3d at 388) (quoting *Daubert*, 509 U.S. at 592)). "[A]s long as there is a reasonable factual basis for the expert's opinion, any objections to his testimony go to its weight and not its admissibility." *Babcock Power, Inc. v. Kapsalis*, 854 Fed. Appx. 1, 8 (6th Cir. 2021) (citing *In re Scrap Metal*, 527 F.3d at 529-31).

Here, Mr. Weir explained at the class certification hearing that his damages framework was based on Plaintiffs' theory of liability in this case, and "it is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion." *System Dev. Integration, LLC v. Computer Sciences Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012); *see* Fed. Judicial Center, Reference Manual on Scientific Evid., 432 (3d ed. 2011) ("In almost all cases, the damages expert proceeds on the hypotheses that the defendant committed the harmful act and that the act was unlawful.").

Finally, Defendant attacks Weir's methodology by questioning his failure to consider certain information regarding class members' individual drug prescription transactions in making his calculations. (*See* ECF No. 111 at 5 ("Weir reviews each transaction on its own, assigning damages any time the customer paid more than Kroger's . . . Savings Club . . . price, without considering the effect that transaction has on the customer's other transactions in a given plan year . . . . Similar issues arise with regard to deductibles and Medicare's different plan stages, which Kroger's experts show need to be taken into account in any damages analysis."). But Kroger's arguments "go to the factual sufficiency of [Mr. Weir's] analysis and not to the reliability of his underlying methodology." *Stephenson v. Fam. Sols. of Ohio, Inc.*, 645 F. Supp. 3d 755, 771

(N.D. Ohio 2022). As the Sixth Circuit has explained, attacks on "'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *In re Scrap Metal*, 527 F.3d at 531 (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (citations omitted)). "[S]o long as the expert witness testimony is not based on speculation, the methodology may be deemed reliable." *Innovation Ventures, LLC v. Custom Nutrition Laboratories, LLC*, 520 F.Supp.3d 872, 887 (E.D. Mich. 2021).

In *Scrap Metal*, for example, the defendant argued that the plaintiffs' expert's testimony as to anticompetitive damages based on scrap price bulletin (SPB) was inadmissible because the expert used an inaccurate database and therefore necessarily reached "erroneous conclusions." 527 F.3d at 529. The Sixth Circuit rejected the argument, noting that "whether [the expert's] opinion is accurate in light of his use of the SPB data goes to the weight of the evidence, not to its admissibility, and the district court appropriately passed the torch to the jury to make this determination." *In re Scrap Metal*, 527 F.3d at 531–32 (citing *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")).

Kroger's argument that Mr. Weir's methodology "is based solely on assumptions provided by Plaintiffs' counsel" is also unpersuasive, as "experts may permissibly rely on assumptions about underlying facts that are stated to them by the client." *Webasto Thermo & Comfort N. Am., Inc. v. Bestop, Inc.*, 2019 WL 3334565, at *7 (E.D. Mich. July 25, 2019). Moreover, as Mr. Weir testified at the class certification hearing, his damages model is adaptable. Kroger may disagree with these alternative approaches for arriving at an estimate, but that is not a basis to exclude. *Bledsoe v. FCA US LLC*, 2022 WL 4596156, at *34 (E.D. Mich. Sept. 30, 2022) ("Any difference in opinion about [a damages expert's] assumptions should be resolved by a jury and is not a proper basis to strike his opinions.").

To the extent Mr. Weir's assumptions were based, in part, on gaps in Kroger's underlying business records, specifically as they relate to transaction data, "mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility'"; the expert's opinion, "where based on assumed facts," need only "find *some* support for those assumptions in the record." *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (emphasis added) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)).

Ultimately, Kroger's disagreements with Weir's report go to the weight of the evidence, not its admissibility. Under the permissive framework established by *Daubert* and Rule 702, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530; Fed. R. Evid. 702 Adv. Comm. Note to 2000 amends. Here, "[t]he question on the table is whether [Mr. Weir's] method can be 'assessed for reliability,' not whether it always gets it right. Disputes about the . . . accuracy of a theory's results, generally speaking, provide grist for adversarial examination, not grounds for exclusion." *See United States v. Gissantaner*, 990 F.3d 457, 464 (6th Cir. 2021) (cleaned up). Accordingly, Kroger's motions to exclude Mr. Weir's testimony (ECF Nos. 94, 111) are **DENIED**.

### 2. Motion to Exclude Susan Hayes' Testimony (ECF No. 110)

After Kroger's experts opined that, to calculate damages in this action, class members' claims need to be re-adjudicated over the entirety of a plan year, and that process requires additional data from PBMs that may not exist, Plaintiffs proffered the rebuttal expert report of Dr. Susan A. Hayes. (See ECF No. 115 at 4). Dr. Hayes is the principal, owner, and founder of Pharmacy Investigators and Consultants and has decades of professional experience includes auditing PBMs on behalf of TPPs, procuring PBM services for TPPs, and conducting fraud, waste, and abuse services for certain government insurance plans. (ECF No. 105-1 at 190–200). She has

worked in healthcare consulting since 1980 and in the PBM industry since 1985. (*Id.*). Before founding Pharmacy Investigators and Consultants in 2019 and its predecessor company, Pharmacy Outcomes Specialists, Dr. Hayes was Vice President of Marketing for Systemed Pharmacy, Inc. and Vice President of Marketing for Walgreens Healthcare Plus. (*Id.*). In addition to her work at Pharmacy Investigators and Consultants, she is an Assistant Professional Practices Professor and the Director of the Health Informatics Masters Degree Program at Roosevelt University, where she teaches two of the graduate level classes. (*Id.*). She is also a Certified Registered Pharmacy Technician in Illinois and has authored research that discusses ethical decision-making in the pharmaceutical industry. (*Id.*).

Kroger seeks to exclude Dr. Hayes' testimony, arguing that her "experience does not include calculating damages in litigation," (ECF No.110 at 6), and that "she has no education, training, or experience in economics or accounting, let alone in calculating damages." (ECF No. 118 at 2). But Rule 702 only requires that an expert have specialized knowledge that "will help the trier of fact to understand the evidence or to determine *a* fact in issue," not *all* facts at issue. Fed. R. Evid. 702(a) (emphasis added); *see also Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 908 (6th Cir. 2004) (allowing expert to testify about "a discrete aspect of police practices").

Kroger does not dispute that Dr. Hayes is qualified to opine about PBMs or the PBM industry standards and practices generally. In fact, as multiple courts have recognized, Dr. Hayes is qualified to speak on these topics. *See e.g.*, *New York City Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 444 (S.D.N.Y. 2022). As one district court explained:

> Hayes's twenty-five years of professional experience in the PBM industry – including experience directly relevant to the industry standards for processing claims and managing pharmacy networks, combined with her accreditation as a Health Care Fraud Investigator (the highest industry accreditation by the National Health Care Anti-Fraud association), and her recent completion of a doctoral program related to fraud in the pharmaceutical industry – are more than

> enough to qualify her as an expert in practices in the PBM industry
> related detecting and preventing fraud.

*Id.* (cleaned up); *see also Argus Health Sys., Inc. v. Benecard Servs., Inc.*, 2011 WL 5822408, at

*1 (W.D. Mo. Nov. 16, 2011) (denying motion to exclude Dr. Hayes's testimony after holding she

has sufficient expertise in "the pharmacy claims industry").

This Court likewise finds Dr. Hayes qualified to offer expert opinions regarding PBM

practices. Drawing on her decades-long experience in auditing PBMs, she has provided helpful

testimony to this Court that rests on a "reliable foundation" and is "relevant to the task at hand."

*See Daubert*, 509 U.S. at 597. Specifically, Dr. Hayes' experience, as described above, provides

reliable principles by which to consider whether PBM data is likely to provide classwide proof and

damages—*not* what those damages should be. Much like it did at the class certification, Kroger

retains the power to attack any defects in Dr. Hayes testimony through "[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof."

*Id*. at 596. Accordingly, Defendant's motion to exclude Dr. Hayes' expert testimony is **DENIED**.

(ECF No. 110).

## B.  Motion for Class Certification

To satisfy the prerequisites under Rule 23(a), Plaintiffs must show that: (1) the class is

sufficiently "numerous" that joinder is unrealistic; (2) the combined claims raise "common"

questions of law or fact; (3) the class representatives' claims are "typical" of the claims of other

members in the class; and (4) the named representatives are in a position to "fairly and adequately"

look after the interests of the other class members. Fed. R. Civ. P. 23(a)(1)–(4). Plaintiffs seek to

certify the following classes:

> **The Ohio Medicare Class**: All persons in Ohio who, at any point
> in time from the period December 9, 2018 through the date on which
> class notice is disseminated, paid in whole or in part for a generic
> prescription drug from The Kroger Co. using their Medicare Part D

drug coverage and where the amount paid was more than the Kroger Rx Savings Club price for that drug.

**The Ohio Caremark Class**: All persons in Ohio for whom prescription drug insurance benefits were provided through Caremark, LLC and who, at any point in time from the period December 9, 2018 through the date on which class notice is disseminated, paid in whole or in part for a generic prescription drug from The Kroger Co. using their insurance where the amount paid was more than the Kroger Rx Savings Club price for that drug.

**The Texas Caremark Class**: All persons in Texas for whom prescription drug insurance benefits were provided through Caremark, LLC and who, at any point in time from the period December 9, 2018 through the date on which class notice is disseminated, paid in whole or in part for a generic prescription drug from The Kroger Co. using their insurance where the amount paid was more than the Kroger Rx Savings Club price for that drug.

(ECF No. 105 at 22). Excluded from each of these classes are: (1) any Judge presiding over this Action, any members of the Judges' respective staffs, and immediate members of the Judge's family; (2) officers and directors of the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest; (3) persons who timely and validly request exclusion from and/or opt-out of the Settlement Class; and (4) the legal representatives, successors or assigns of any such excluded persons. (*Id.*).

### 1. Rule 23(a) Requirements

#### a. Numerosity

Rule 23(a)(1) requires that the "class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(A)(1). To satisfy numerosity, "impracticability of joinder must be positively shown, and cannot be speculative." *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005). The Sixth Circuit has found even classes of 35 to be sufficient to meet this requirement. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012) (citing

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1076 (6th Cir. 1996)); *see also Castillo v. Morales, Inc.*, 302 F.R.D. 480, 487 (S.D. Ohio 2014) (Marbley, J.) (class of forty or more is "[o]ften . . . sufficient to meet the numerosity requirement"). Plaintiffs argue that "numerosity is easily satisfied because each of the proposed Classes contains thousands of members." (ECF No. 76 at 18 (citing Weir Report, ECF No. 76-17 ¶ 28)). Defendant does not dispute that Plaintiffs' proposed class satisfies numerosity. This Court therefore finds that plaintiffs have satisfied their burden of showing by a preponderance of the evidence that the putative class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

### b. *Commonality*

Rule 23(a)(2) requires Plaintiffs to identify "questions of law or fact common to the class." To satisfy this requirement, Plaintiffs "at a minimum must show that the action will 'resolve an issue that is central to the validity of each one of the claims.'" *In re Nissan*, 122 F.4th at 246 (quoting *Dukes*, 564 U.S. at 350). A district court's task under Rule 23(a)(2) is to "examine the material elements of each claim and determine which ones, if any, yield a common answer." *Id*. Mindful of its obligation to engage in a rigorous analysis of the Rule 23(a) factors, this Court will evaluate each asserted claim under the standard articulated by the Supreme Court and reaffirmed by the Sixth Circuit. *See In re Nissan* 122 F.4th at 246 (requiring courts analyzing commonality under Rule 23(a)(2) to "walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers").

### (1) *Fraud*

In order to satisfy the commonality standard, Plaintiffs must convince this Court that a "common question of law or fact" will ultimately advance the litigation on Plaintiffs' proposed class claims for fraud under the laws of Ohio and Texas. To prevail on a claim of fraud under Ohio law, Plaintiffs must prove: (1) a representation, or silence where there is a duty to disclose; (2)

which is material to the transaction; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to its truth or falsity that knowledge may be inferred; (4) with the intent to mislead another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Williams v. Aetna Finance Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (Ohio 1998); *Burr v. Bd. of Cnty. Comm'rs of Stark Cnty.*, 23 Ohio St. 3d 69, 73, 491 N.E.2d 1101, 1105 (Ohio 1986). Similarly, the elements of common law fraud under Texas law are: (1) a material representation; (2) that is false; (3) which was either known to be false when made or was made recklessly without knowledge of its truth; (4) with the intent that the representation be relied upon; (5) that it was relied upon; and (6) which caused injury. *Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 929–30 (Tex. 1996).

Plaintiffs' fraud claim encompasses three theories of liability: "direct misrepresentations to Plaintiffs [and absent class members] in the form of inflated copayments," "indirect misrepresentations to Plaintiffs [and absent class members] by reporting the inflated U&C prices to NCPDP, which [Kroger] knew would be relayed to them in the form of inflated copayments," and "material omissions by failing to disclose [the] true U&C prices." (ECF No. 42 at 7). These theories, according to Plaintiffs, implicate a common question—namely, "whether Kroger should have included its [Savings Club] prices when determining the U&C prices to report for insurance transactions." (ECF No. 76 at 19). Kroger does not dispute that this question is central to Plaintiffs' claims, but argues that, for the Ohio Medicare Class at least, this question yields no common answer because it would depend on how the contract between Kroger and the PBM processing that member's claim defines the term.

For two of three proposed classes—the Ohio Caremark Class and Texas Caremark Class— the parties' squabble over how U&C price is defined is not decisive. This is because Kroger's contract with PBM Caremark would be the same for all members of the Ohio Caremark Class and

the Texas Caremark Class.[4] Assuming then that PBM-Pharmacy contracts are, as Kroger contends, the authoritative source of how U&C is defined, the question of "whether Kroger should have included its [Savings Club] prices when determining the U&C prices to report for insurance transactions" will yield a common answer as to the Ohio Caremark Class and Texas Caremark Class members. Accordingly, Plaintiffs have satisfied the commonality requirement of Rule 23(a) with respect to the Ohio Caremark Class and the Texas Caremark Class.

The Ohio Medicare Class, however, raises thornier questions. Relying on Dr. Kenneth Schafermeyer's expert testimony, Plaintiffs contend that "decades of industry practice establish that the U&C price has consistently been understood in the industry to mean the lowest price that a pharmacy would offer to a cash customer (*i.e.*, a customer paying without using insurance), including any discounts offered by the pharmacy to the cash customer for a specific drug product on a particular day at a particular pharmacy." (ECF No. 76 at 10–11 (citing ECF No. 76-82 ¶ 29). As such, Plaintiffs maintain that the answer to "whether Kroger should have included its [Savings Club] prices when determining the U&C prices to report for insurance transactions" will be the same for all members of the Medicare class. (*Id.* at 18–19).

In support of this uniform definition, Plaintiffs draw from the Seventh Circuit's decision in *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016). There, the Seventh Circuit held that, unless state regulations provide a different meaning, the U&C price "is defined as the 'cash price offered to the general public,'" and concluded the discount prices for certain generic prescription drugs offered by Kmart to cash customers who participated in its discount program— not the higher prices paid by non-program cash customers—constituted the "usual and customary price" for purposes of Medicare reimbursement. *Garbe,* 824 F.3d at 643. Plaintiffs read *Garbe* as

---

[4] Under that contract, Kroger's reporting of the U&C price "must include any applicable discounts offered to attract customers." (ECF No. 76-17).

reinforcing their position that, for transactions involving Medicare Part D, the CMS's "administrative definition of U&C controls" such that "any supposed variations of U&C definitions in contracts between Kroger and PBMs are irrelevant." (ECF No. 105 at 15).

At the class certification hearing, Kroger's counsel probed Dr. Schafermeyer on Plaintiffs' reference to the "administrative definition of U&C." Dr. Schafermeyer explained that, consistent with his report and Plaintiffs' arguments, this definition is drawn from two CMS sources: (1) a 2006 Q&A memo regarding the lower cash price policy for Medicare Part D prescriptions;[5] and (2) a 2006 Medicare Prescription Drug Benefit Manual.[6] (*See* Hr'g Tr. vol. I, 74:15–76:1, March 19, 2025, ECF No. 144; Schafermeyer Report, ECF No. 76-18 ¶¶ 105–106 (SEALED)). Both pieces of guidance, according to Dr. Schafermeyer, make clear that Kroger is expected to report its Savings Club price as the "usual and customary" price on Medicare insurance claims. (Schafermeyer Report, ECF No. 76-18 ¶¶ 105–106 (SEALED) (citing Tudor Memo, *supra* note 5, at 1–2 n.1 (discussing Wal-Mart's $4 discount program as example of pharmacy program "offering a reduced price for certain generics to its customers," and stating that "[t]he low Wal-Mart price [of $4] on these specific generic drugs is considered Wal-Mart's 'usual and customary' price"); PBDM, *supra* note 6, at 19 n. 1 (same))).

Kroger attacks Plaintiffs' arguments on multiple grounds. First, Kroger samples some of its PBM contracts to show how some define U&C to exclude discount programs like the Savings Club, whereas others include them, while still others do not define U&C at all and instead

---

[5] *See* Memorandum from Cynthia Tudor, Dir., Medicare Drug Benefit Grp., Ctrs. for Medicare & Medicaid Servs., U.S. Dep't of Health & Human Servs., to All Medicare Part D Sponsors (Oct. 11, 2006) [hereinafter Tudor Memo], https://perma.cc/3RK7-54BD.

[6] *See* U.S. Dep't of Health and Human Servs., Ctrs. for Medicare & Medicaid Servs., Medicare Prescription Drug Benefit Manual, Pub. No. 100-18, ch. 14, § 50.4.2 at 19 n.1 (2006) [hereinafter PDBM], https://perma.cc/MW6AH4P6.

incorporate the definition provided by the PBM's network pharmacy policies. (*See* ECF No. 94 at 35–36). According to Kroger, these contractual differences "mean that no one set of facts will resolve the question of whether Kroger contractually misreported its U&C prices" when it comes to the Medicare class. (*Id.*).

Kroger's argument misses the forest for the trees. Plaintiffs here are not bringing breach-of-contract claims.[7] And as Dr. Schafermeyer explained, an agreement between Kroger and the PBM would not change the reasonable expectations of insured customers, who are not parties to this agreement: "While pharmacies and their PBM partners might agree amongst themselves to exclude a specific discount from the calculation of U&C, neither the payer nor its insured beneficiaries would necessarily be aware of this secret arrangement as neither are parties to the [agreement]." (ECF No. 76-18 ¶ 176). In other words, the arrangement between Kroger and PBMs would not change the fact that Kroger's representations or omissions *to Plaintiffs* were deceiving. (*See* Order Denying Motion to Dismiss, ECF No. 42, 7–11 (agreeing that "the copayment itself [constitutes] a plausible misrepresentation"; finding "Plaintiffs' allegation that Kroger made misrepresentations to Plaintiffs and class members each time it charged them for copays that were calculated based on its inflated U&C prices" . . . enough to ground a plausible theory of fraud by direct misrepresentation"; and concluding that "Plaintiffs' fraud claims are viable under an omission theory as well" because "[i]nsofar as [the inflated copayments charged to pharmacy

---

[7] This distinguishes at least two of the cases Kroger cites. *Cf. Ewalt v. Gatehouse Media Ohio Holdings II, Inc.*, No. 2:19-CV-4262, 2024 WL 1270786 (S.D. Ohio Mar. 26, 2024) ("Simply put, the allegedly common question of '*did Defendant breach the contract*' is not common because there are many different contracts with meaningfully different language. Indeed, even a single class member may have multiple contracts with Defendants, each with different language. Because the legal question of whether Defendant breached depends on the language of the contract—and because the language of the contracts is not uniform—there is no commonality." (emphasis added)); *Bell v. Bimbo Foods Bakeries Distribution, Inc.*, No. 11 C 03343, 2013 WL 6253450, at *10 (N.D. Ill. Dec. 3, 2013) ("The Court would have to [] compare and analyze the terms of each distributor agreement to determine whether each distributor had established *that Bimbo breached a particular agreement*. Because of this individualized analysis, Bell has failed to satisfy the commonality and predominance requirements." (emphasis added)).

customers] were misleading partial representations, a corrective duty of disclosure could attach" and "Kroger's publication of its Savings Club prices online does not preclude it from fraudulently omitting that information at the register").

Next, Kroger emphasizes that *Garbe* is an "out-of-circuit, non-binding" decision that "interpreted 'U&C' as used in governmental programs with the important caveat: '[u]nless state regulations provide otherwise.'" (ECF No. 92 at 33 (quoting 824 F.3d at 643)). According to Kroger, "[t]he same rationale applies to contracts between private parties," i.e., that a standard definition of U&C controls unless state regulations *or contracts*—including pharmacy-PBM contracts—provide otherwise. (*Id.*). Kroger and its experts also distinguish the facts underlying *Garbe*, noting that "the Seventh Circuit found that [Kmart's] program fee of $10 — approximately 72% less than Kroger's Savings Club membership fee for individual members — was 'nominal' and that 'barriers to joining' were 'almost nonexistent.'" (*See* Hughes Report, ECF No. 92-13 ¶ 63 (quoting *Garbe*, 824 F.3d at 643);[8] Nordby Report, ECF No. 92-17 at 29 ("While Kroger's Savings Club *membership* was available to customers who satisfied [certain] requirements . . . , Kroger's Savings Club *prices* were available only to Kroger's Savings Club *members*, which required agreeing to terms and conditions, paying a membership fee, and taking other steps to enroll.")).

In its sur-reply and at the hearing, Kroger also argued that *Garbe* erroneously relied on *Medicaid* regulations to interpret U&C for Medicare Part D transactions, for which "CMS does not—and by statute, cannot—control prices" given Medicare's "non-interference" clause, *see* 42 U.S.C. § 1395w-111(i)(1)–(2) (providing that, "[i]n order to promote competition," the HHS Secretary "may not interfere with the negotiations between drug manufacturers and pharmacies

---

[8] Dr. Hughes' estimate seems to be based on the $72 group membership fee, which covers "[u]p to six members, including pets." (*See* Kroger Brochure, Ex. D to Def's Opp'n to Pls.' Mot. for Class Cert., ECF No. 92-6).

and PDP [prescription drug plan] sponsors" and "may not require a particular formulary or institute a price structure for the reimbursement of covered part D drugs.").[9] (*See* ECF No. 112-1 at 4–6).

Kroger is correct that Medicare and Medicaid have generally differed in the latitude given to the government over drug pricing and negotiations. *Compare* 42 USC § 1395w–111(i) (Medicare's non-interference clause) *with* 42 U.S.C. § 1396r-8 (Medicaid's rebate agreement requirement). Additionally, at the class certification hearing, Dr. Schafermeyer concurred with Kroger's experts that the industry-accepted understanding of "U&C" can be displaced by state regulations or contract. (Hr'g Tr. vol. I, 67:9–22, March 19, 2025, ECF No. 144 (Schafermeyer Test.)). He noted, for example, that Kroger *does* report its Savings Club price as the U&C price in a dozen states. (*Id.* 38:21–39:7). And although he could not opine on which definition would control if "U&C" was defined differently in a contract between a pharmacy and PBM, than in a contract between that same PBM and a TPP (*id.* 69:2–19), he acknowledged that a contractual definition could displace the standard CMS definition. (*Id.* 67:9–22).

But even if this Court accepts that no single statutory or regulatory "U&C" definition governs Medicare Part D transactions, the Ohio Medicare Class still has enough in common, with

---

[9] This Court notes that, in 2022, Congress passed the Inflation Reduction Act ("IRA"), which amended the non-interference clause to carve out an exception for "negotiation-eligible drugs." *See* Pub. L. No. 117-169 §§ 11001-11003, 136 Stat. 1818 (codified in pertinent part at 42 U.S.C. §§ 1395w-111(i)(3), 1320f, and 26 U.S.C. § 5000D). Specifically, the IRA directs HHS to establish a Drug Price Negotiation Program "that shifts the price-setting mechanism for many of America's highest-selling drugs," and requires HHS to select "negotiation-eligible drugs," and then negotiate a "maximum fair price" with the manufacturers of those drugs. *See Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 494 (5th Cir. 2024).

respect to federal requirements, applicable regulations, and other disclosure mandates,[10] that inform the merits question of whether Kroger should have reported its Savings Club prices as U&C prices. Kroger's argument that the question of fraud turns on the unique terms of over a dozen PBM contracts collapses under its own weight. If the differences between these contracts truly dictated how Kroger reported its U&C prices, then its reporting to Caremark, which defined "U&C" as *including* Savings Club prices, would have borne out its theory. The far simpler explanation, and the one that comports with the record currently before this Court, is that Kroger reports its U&C prices exclusive of the Savings Club prices, *irrespective* of how its contracts with PBMs defined the term.

Nor is this Court persuaded, for purposes of commonality, by Kroger's argument that *even when* the PBM-pharmacy contract defines U&C a certain a way, the customer still cannot benefit from whatever that U&C price is, unless the particular Kroger-PBM contract explicitly tells Kroger to charge the "lesser of" a customer's payment options. (*See* Hr'g Tr. vol. III, at 521–24, March 21, 2025, ECF No. 146). In support of this proposition, Kroger points to a provision in the Caremark contract that sets Kroger's reimbursement at "the lower of" three payment benchmarks, one of which is the U&C price minus the amount the consumer pays. (*See* Caremark-Kroger Agreement § 4.3, ECF No. 84-2 at 590 (SEALED)). This provision, according to Kroger, "shows that the parties knew how to write a lesser of logic provision" but deliberately drafted their

---

[10] *See e.g.*, Patient Right to Know Drug Prices Act, Pub. L. No. 114-263, 132 Stat. 3672 (2018) (codified in part at 42 U.S.C. § 300gg-19(b) (barring contractual clauses that prohibit pharmacies from informing enrollees of "any differential between the enrollee's out-of-pocket cost under the plan or coverage with respect to acquisition of the drug and the amount an individual would pay for acquisition of the drug without using any health plan or health insurance coverage."); *see also* Know the Lowest Price Act of 2018, Pub. L. No. 115-262, 132 Stat. 3670 (codified at 42 U.S.C. § 1395w-104(m)) (similar law applicable to Medicare-related prescription drug plans); Ohio Dep't Ins., *Pharmacy Benefits – Prohibited Practices*, Bulletin 2018-02, https://perma.cc/L6NM-LPBD (explaining that the practice of "prohibiting any person, directly or indirectly, from informing, by any means, an individual about less expensive ways to purchase prescription drugs that may also be available under any insurance policy or benefit plan" violates R.C. 3959.12(A)(5), R.C. 3923.02, and R.C. 3923.021).

agreement so "that the consumer doesn't have lesser logic." (*See* Hr'g Tr. vol. III, 523:21–24, March 21, 2025, ECF No. 146).

Kroger's argument, for one, fails to appreciate what happens when a customer's healthcare plan sets the co-payment as a fraction of the pharmacy's usual and customary price for a particular drug. Dr. Hughes alluded to this scenario when discussing how U&C prices, and the customer's experience more broadly, are affected when a pharmacy-PBM contract expressly requires the pharmacy to charge a customer the "lesser of" certain benchmarks, as opposed to when the pharmacy-PBM contract is silent on the issue. (*See* Hr'g Tr. vol. II, 266:8–269:19, March 20, 2025, ECF No. 145). When the pharmacy-PBM contract is silent on whether the customer is entitled to "lesser of" logic, Dr. Hughes explained that another contract determines whether to charge a customer the "lesser of" any particular price points. (*Id.* 266:8–17, 267:2–5). That contract could be the TPP-PBM contract or, if that is silent too, the customer's health plan. (*Id.* 267:2–20). Dr. Hughes points out that sometimes the customer's health plan does not depend on the U&C price at all and instead mandates a flat co-payment in all instances. (*Id.* 269:9–12).

It is important to recall how all of this information, particularly the information that determines the appropriate payment formula to apply to a customer's prescription benefit, is processed. Kroger's corporate witness, Jeffrey Stackman, explained that the process between the pharmacy and the PBM is largely automated, and that Kroger populates the U&C field when the

PBM flags that it needs it.[11] Kroger does not explain how its "contract-by-contract" U&C determination is factored into this process and, absent any evidence, this Court declines to speculate.

After careful consideration of the testimony and exhibits submitted, this Court finds that Plaintiffs' fraud claim raises common questions of fact and law for all three classes. Specifically, Plaintiffs and absent class members would have suffered the same type of injury—overpayments—arising out of a common scheme to defraud insured customers by Kroger's failure to report the Savings Club prices as U&C prices when routing prescription claims to PBMs. Additionally, the record indicates that whether Kroger should have reported its Savings Club price as its U&C price under Medicare Part D will implicate common questions—namely, whether a single U&C definition governs and whether Medicare beneficiaries are entitled to "lesser of" logic—as well as common proof, including federal requirements, applicable regulations, and other disclosure mandates. The fact that Kroger-PBM contracts differ in their definitions of U&C prices is a relevant question; but it is insufficient to defeat commonality. *See Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182, 199 (D.R.I. 2021) ("The Court is satisfied that a common question exists regarding whether Defendants engaged in a scheme to defraud [third party payors] by failing to report [CVS's Health Savings Program] prices as U&C prices, and accordingly, the commonality prerequisite is also met.").

---

[11] There is some ambiguity on this point, but generally, Mr. Steckman noted that Kroger submits information to a "switch" that fills out a form with NCPDP fields, including one for the U&C price: field 426DQ. (Steckman Dep. 109:8–111:14, ECF No. 76-19 at 20-24). When asked how that field is filled in, Mr. Steckman testified that Kroger's "system fills that in with the retail cash. The U&C is submitted from the retail cash price for our commercial payers. So our system submits it, and then [the switch] takes it from there." (*Id.*). Steckman was then asked if this Kroger uses an automated process to report the U&C, and Steckman explained that Kroger's computer system looks up the U&C price in Kroger's "own platform that we use to process prescriptions"—which "uses average wholesale price." (*Id.*). He clarified, however, that, through the "switch," "the PBM is telling [Kroger] what is needed, and [Kroger] grabs the piece that is needed for the form." (*Id.*).

*(2) Unjust Enrichment*

A similar analysis applies for the unjust enrichment claim under Ohio and Texas law. Under Ohio law, an unjust enrichment claim requires a showing that: (1) a benefit was conferred by the plaintiff on the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances in which it was unjust to do so without payment. *See Bunta v. Superior VacuPress, L.L.C.*, 2022-Ohio-4363, 171 Ohio St. 3d 464, 474, 218 N.E.3d 838, 848–49 (Ohio 2022) (citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (Ohio 1984)). The purpose of an unjust enrichment claim "is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." *Id.* (quoting *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (Ohio 1954)). Likewise, a party may recover under the unjust enrichment theory under Texas law "when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *see also RigUp, Inc. v. Sierra Hamilton, LLC*, 613 S.W.3d 177, 192 (Tex. App. 2020) ("[T]o maintain its unjust enrichment claim, Sierra was required to prove that RigUp obtained a benefit from Sierra by fraud, duress, or the taking of undue advantage.").

Here, Named Plaintiffs seek to show that they conferred a benefit on Kroger when they overpaid for their prescription medications during the class period. Whether Kroger knowingly retained a benefit unjustly will turn on the common question of whether those payments contained improper overcharges due to Kroger's inflated U&C prices. Accordingly, like the fraud claim, the answer to this common question will be the same across all members proposed classes. If Kroger was required to report its Savings Club prices as U&C prices, then retaining a benefit based on overcharging Plaintiffs and absent class members is unjust in every instance. By failing to account for its Savings Club prices when reporting its U&C prices when required by PBM contracts or

other mandates, Kroger either wrongfully secured a benefit or it did not. Regardless of how those questions are answered, the answer will be the same for all proposed class and subclass members.

Accordingly, Plaintiffs have satisfied the commonality requirement for Ohio Medicare, Ohio Caremark, and Texas Caremark classes for unjust enrichment.

### (3) Negligent Misrepresentation

Under Texas law, the elements for a claim of negligent misrepresentation are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). Here, Named Plaintiff Lewis contends that, because all the direct and indirect representations and omissions at issue were made in the course of Kroger's business, the information that Kroger supplied (its U&C prices and copayment quotes) was either false across the board for the Texas Caremark class or it was not.

To the extent Kroger argues that the individualized nature of assessing Plaintiffs' claims render class certification improper, this Court concludes that the argument sounds more in Rule 23(b)'s predominance requirement, discussed below, than Rule 23(a)'s commonality requirement. For commonality, Plaintiffs have met their burden of showing that a common question of law or fact across the claims. *See Young*, 693 F.3d at 544 ("While the commonality element of Rule 23(a)(2) requires showing *one* question of law or fact common to the class, a Rule 23(b)(3) class must show that common questions will *predominate* over individual ones." (first emphasis added)).

*c. Typicality*

Plaintiffs bringing a putative class action must also show that their "claims or defenses" are "typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). This requirement "determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). Typicality and commonality "tend to merge in practice." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013) (cleaned up). "[A] necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Young*, 693 F.3d at 542 (quoting *Sprague*, 133 F.3d at 399). Named Plaintiffs' claims need not "always involve the same facts or law, provided there is *a* common element of fact or law." *Beattie*, 511 F.3d at 561 (emphasis added) (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n. 31 (6th Cir. 1976)). As a general matter, "a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Am. Med. Sys.*, 75 F.3d at 1082.

Kroger argues that Kirkbride's claims are atypical of the classes she seeks to represent, because: (1) the only relevant PBM that managed her prescription is Caremark, and she therefore cannot represent an Ohio Medicare class because it "would contain many individuals who were not on the plan of [Caremark]"; and (2) she has no qualifying transaction because she did not purchase a drug for which she paid more than the Savings Club price, when the membership fee is allocated and factored into the price. (ECF No. 92 at 22–26).

For the reasons noted above, *supra* Section III.B.1.b(1), Kroger's first argument fails because Plaintiffs have sufficiently demonstrated that Kirkbride's claims on behalf of the Ohio Medicare Class "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members," and that her claims "are based on the same legal theory." *See Beattie v. CenturyTel.*, *Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (citation omitted).

With respect to Kirkbride's qualifying transaction, Kroger argues that Kirkbride's $11.79 drug purchase on December 7, 2020 would have cost her $12—not $9.82—under the Savings Club because "some portion of the Savings Club membership fee must be allocated when determining the actual Savings Club price for a drug." (ECF No. 92 at 23). Specifically, Kroger's expert Jed Smith, a licensed CPA, allocated the appropriate membership fee to Kirkbride's transaction by dividing the sum of the membership fees Kroger collected that year by the number of Savings Club transactions that same year. (Smith Report, ECF No. 92-9 ¶¶ 68–70). The resulting fee for 2020, according to Mr. Smith, is $2.18. (*Id.*). Kroger thus contends that Kirkbride did not in fact pay "more than the Kroger Rx Savings Club price for that drug," as the class definitions provide, therefore rendering her ineligible to represent classes of insured Caremark or Medicare customers that have been overcharged. (ECF No. 92 at 23).

This argument might hold more water if, in the dozen states that Kroger reports its Savings Club price as the U&C price, Kroger included the proposed allocated membership fee it now suggests should apply. In any event, Plaintiffs' theory of liability and the basis of their claims against Kroger here is that Kroger *should have* reported the Savings Club prices as its U&C prices *exclusive* of the membership fee. In *Compound Prop. Mgmt. LLC v. Build Realty, Inc.*, 343 F.R.D. 378 (S.D. Ohio 2023), the court rejected a similar argument by defendants, finding that named plaintiffs in a putative class action who brought on behalf of real-estate investors against organizers of a real-estate scheme for claims including unjust enrichment satisfied Rule 23's typicality

requirement, notwithstanding the differences in how the plaintiffs were affected by the scheme. Specifically, the court explained that "all named Plaintiffs experienced the same transactional structure that Plaintiffs claim systematically defrauded them while enriching Defendants." *Id.* at 400. Given "typicality's lenient standards," the court in *Compound* rejected defendants' attempt to differentiate among the named Plaintiffs based on varying "contractual addendums," different levels of understanding the "trust structure," and the unique default rate that applied to each of their transactions. These differences, according to the court, "do not 'strike at the heart' of their common claims" which "attack the structure of the transaction itself, not merely the way that structure gave rise to particular harms in a given case." *Id*. While the default rate "could factor into potential damages," the court concluded that it did not "alter the nature of the named Plaintiffs' (allegedly) typical injuries." *Id*. at 401. Plaintiffs' "common experiences, coupled with their invocation of common legal theories to remedy the harms they allegedly suffered," the court concluded, "give the named Plaintiffs typicality within the class." *Id*. at 400.

So too here. Named Plaintiffs' claims are typical of the claims of absent members of the proposed classes because they allege a singular fraudulent scheme involving Kroger's misreporting of its U&C prices. (*See* ECF No. 105 at 8 (responding that their theory of liability is "that Kroger should have used its Kroger Rx Savings Club prices as its U&C prices *without* including the membership fee") (citing ECF No. 30 ¶ 18)). This Court, therefore, concludes that Named Plaintiffs have met their burden in satisfying the typicality requirements of Rule 23(a)(3).

### d.  Adequacy of Representation

Finally, for a class to be certified under Rule 23(a), the proposed class representatives must demonstrate that they "will fairly and adequately protect the interests of the class[,]" Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of

the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (citations and internal quotation marks omitted). A court "looks to two criteria for determining adequacy of representation: '[1] the representative must have common interests with unnamed members of the class, and [2] it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Young*, 693 F.3d at 543 (quoting *In re Am. Med. Sys.*, 75 F.3d at 1083 (citation omitted)).

Kroger first asserts that Kirkbride is inadequate to represent both the Ohio Medicare Class and Ohio Caremark Class because the fact that she might recover as a member of both classes poses a conflict of interest and, "in settlement negotiations, Kirkbride would be incentivized to favor a better settlement for the Ohio Caremark class, to the detriment of the Ohio Medicare class." (ECF No. 92 at 26–27). But Kroger fails to cite any applicable authority for this proposition. And, as Plaintiffs correctly point out, this is "not a limited funds case where members of the two classes would be required to fight over a finite amount of money; Kroger can pay members of both classes." (*See* ECF No.105 at 9 (citing *Makaeff v. Trump Univ., LLC*, 309 F.R.D. 631, 644 (S.D. Cal. 2015) (distinguishing instances in which there are two cases against one company that is likely to have insufficient assets and insurance to cover its liability in both)). In addition, because the members of the Ohio Caremark Class and the Ohio Medicare Class seek the same relief, this Court agrees that the interests of the two classes are aligned rather than in conflict. *Metts v. Houstoun*, 1997 WL 688804, at *4 (E.D. Pa. Oct. 24, 1997) ("While plaintiffs' counsel seeks to represent two classes, there appear to be no conflict of interest that would disqualify them from representing both."). To the extent there is any overlap between the Classes, moreover, it will be accounted for in the damages phase so as to avoid double recovery.

Kroger next argues that Named Plaintiffs are not adequate class representatives because they are "both confused and not familiar with the allegations of [their] own complaint or the claims

asserted therein, and . . . lack [] knowledge about the case." (ECF No. 92 at 27–29). As a threshold matter, courts in the Sixth Circuit evaluate proposed class representatives for "conflicting interest[s], not [] personal qualifications." *Rankin v. Rots*, 220 F.R.D. 511, 520 (E.D. Mich. 2004). At the same time, proposed class representatives must not "demonstrate so little knowledge of and involvement in the case that [they] are unable to protect class interests from possibly competing class counsel interests," *In re AEP ERISA Litig.*, No. C2-03-67, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008), or participate "so minimal[ly] that they virtually have abdicated to their attorneys the conduct of the case." *Ross*, 257 F.R.D. at 451 (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727–28 (11th Cir. 1987)); *see also Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir. 2012) (attacks on a class representative's credibility goes to adequacy only when the attacks "are so sharp as to jeopardize the interests of absent class members").

Citing Named Plaintiffs' deposition testimonies, Kroger contends that Lewis and Kirkbride are inadequate to represent the proposed classes because they do not understand the terms "usual and customary" or "U&C"; did not know that "this lawsuit relates to the amount that Kroger reports as its usual and customary price"; had little knowledge of how Kroger's Savings Club plays into all this; and appeared to confuse terms like "retail price" and "U&C price." (ECF No. 92 at 27-29).

That is not surprising. It took over a thousand pages of expert-related briefing, reports, and deposition testimony—along with six live experts testifying at a two-day evidentiary hearing—for counsel to explain the labyrinthine drug pricing system under which Kroger operates. And Kroger's own experts recognize how extraordinarily opaque this industry is. This opacity, for the most part, stems from complex, interdependent relationships between pharmacies, intermediate benefits managers (PBMs), insurance providers, and other pharmaceutical players—relationships that remain shrouded in secrecy, particularly when it comes to pricing structures and contractual provisions. But Medicare and Medicaid also show how government oversight remains fractured

38

across agencies and enforcement priorities. Like the three-card monte hustler, the pharmaceutical player can keep darting between contractual fine print; ever-shifting jargon; and proprietary pricing models, as the consumer stays squinting at the table trying to discern why they pay what they pay for their prescriptions. Between "formularies" and "tiers," "co-pays" and "co-insurance," "deductibles" and "out of pocket maximums," the lexicon itself becomes a barrier to understanding. A marketplace *this* reliant on confusion has, much like the dealer in three-card monte, created a game where it does not matter where each pharmaceutical participant lands. Each can rest assured that the onus of deciphering the system will fall not on those who profit from it, but on the "mark" who is forced to endure it. This Court declines to indulge such a misallocation of responsibility.

Plaintiffs here understand that this case is about Kroger overcharging them for their prescription drugs, and this lay understanding about the basic facts and claims is more than sufficient. *See In re AEP ERISA Litig.*, 2008 WL 4210352, at *2 ("The threshold for establishing adequacy is quite low and will be met so long as the named plaintiff's involvement in the case shows that he or she is not merely a pawn of the class lawyers."); *see also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008) ("[I]n complex securities litigation, named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel") (internal quotation omitted).

Kroger also argues that Ms. Kirkbride and Ms. Lewis are atypical of the class and inadequate class representatives because they "continued to purchase drugs from Kroger after learning of Kroger's U&C reporting practices, creating unique defenses as to them." (ECF No. 92 at 18). Courts, however, have already rejected similar arguments in similar cases. *See e.g.*, *Sheet Metal*, 540 F. Supp. 3d at 202 ("[T]he Court disagrees that any purported actual knowledge of the HSP pricing scheme on the part of the named Plaintiffs renders them inadequate or atypical class

representatives."). Moreover, any defense based on the transactions at issue will not be unique to Named Plaintiffs and so "it is not entirely clear either defense will be atypical." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 406 (S.D.N.Y. 2015); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 39 (E.D.N.Y. 2008) ("Thus, far from being atypical, the voluntary payment doctrine issue may be common to numerous class members.").

To the extent Kroger suggests that Plaintiffs could have shopped elsewhere but chose not to, Plaintiffs note that "many of the other pharmacies like Walgreen that served as supposed alternatives for Plaintiffs are engaged in the same kind of U&C overcharges as Kroger, meaning that Plaintiffs could not avoid being overcharged even if they shopped elsewhere." (ECF No. 105 at 13–14). Accordingly, it is not clear that any defense based on this argument will create typicality or adequacy issues across the class. Additionally, there is no evidence that Plaintiffs had reasonably practical and economical alternatives while preserving important continuity of healthcare objectives. Plaintiffs' decisions to continue making non-discretionary purchases do not negate their earlier reliance on Kroger's representations. *See Boswell v. Costco Wholesale Corp.*, 2016 WL 3360701, at *5 (C.D. Cal. June 6, 2016) ("[E]ven if Plaintiffs still would have purchased the product, but would not have paid as much, "the extra money paid . . . is economic injury and affords the consumer standing to sue.").

The voluntary payment doctrine also only bars claims where there is full knowledge of the facts by the person making the payment. *Klopfenstein v. Fifth Third Bank*, 2023 WL 3250622, at *6 (S.D. Ohio Mar. 29, 2023); *Corcoran v. CVS Health*, 2017 WL 3873709, at *7 (N.D. Cal. Sept. 5, 2017), *rev'd and remanded sub nom. Corcoran v. CVS Health Corp.*, 779 F. App'x 431 (9th Cir. 2019) ("Putative class members likely did not understand the relationship between the pharmacy's U&C and what the pharmacy charges them, which may be at times less than or more than the HSP program prices."). Because Defendant argues that Plaintiffs do not adequately

understand the term "usual and customary," Plaintiffs persuasively respond that the voluntary payment doctrine is not likely to apply.

In sum, there is no evidence that Plaintiffs' interests are antagonistic or in some way conflict with the interests of the unnamed class members. This Court has closely reviewed the record, and discerns no reason why Named Plaintiffs would not fairly and adequately protect the interests of the class. This Court is therefore satisfied that Plaintiffs and counsel have met the adequacy requirement of Rule 23(a)(4).

### 2.  Rule 23(b) Requirements

In addition to meeting the Rule 23(a) requirements, Plaintiffs must show that each claim qualifies under at least one Rule 23(b) category. Plaintiffs here proceed solely under Rule 23(b)(3), contending that the action is worthy of class treatment because "common questions predominate over issues affecting individual plaintiffs." Fed. R. Civ. 23(b)(3). Rule 23(b)(3) has two components: predominance and superiority. *Build Realty*, 343 F.R.D. at 406. Rule 23(b)(3) also contains an "implied ascertainability" requirement. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471 (6th Cir. 2017) ("[A] 'class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'") (quoting *Young*, 693 F.3d at 537–38).

### a.  Predominance

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 623. "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young*, 693 F.3d at 544 (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011)). But "[a] plaintiff class need not prove that each element of a claim can be established

by classwide proof." *In re Whirlpool*, 722 F.3d at 858 (citing *Amgen*, 568 U.S. at 468). Indeed, "[a] class may be certified based on a predominant common issue even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co*., 965 F.3d 452, 460 (6th Cir. 2020) (citation and internal quotation marks omitted).

Kroger contends that individual issues predominate over common issues here because, "to determine if the person was damaged, . . . one would need to know if the price the customer paid was tied to the U&C price." (ECF No. 92 at 39). In other words, "[i]f the U&C price had no bearing on how the customer was charged, then how Kroger reported its U&C price is irrelevant." (*Id.*). At oral argument, Kroger's counsel took it even further: "We can say our U&C price is a billion dollars," but "[i]f U&C is not a basis for how the patient pays under the contract," then whether Kroger misrepresented the U&C price does not matter. (*See* Hr'g Tr. vol. III, 521:2–11, March 21, 2025, ECF No. 146).

In *Sheet Metal,* the District Court for the District of Rhode Island rejected a similar argument when certifying a class of TPPs in an action alleging that CVS engaged in a fraudulent scheme to overcharge for prescription drugs by misreporting its U&C prices. *See Sheet Metal*, 540 F. Supp. 3d at 182. Like Kroger here, defendants there argued that "common issues do not predominate because there are too many issues requiring individual contract interpretation," explaining, for example, that "to have sustained injury under the alleged scheme at issue, [the TPP] must have paid an overcharge when CVS failed to include [Health Savings Plan] prices in its U&C prices," and "that determination is dependent on the drug-pricing formula dictated by individual contracts, including generic effective rate discounts ('GERs')." *Id.* at 207. Recognizing that there "may be upwards of 40,000 contracts" involved, the court nonetheless concluded that "there will

be a small universe of answers to the common question posed," and that the "contract language can be sorted into various buckets and litigated group by group." *Id.*

The court further opined that "[i]t is not fathomable (or supported by evidence) that the putative class TPPs and the at-issue PBMs drafted 40,000 contracts with 40,000 distinct lower-of-U&C pricing provisions." *Id.* at 208 (citing *Corcoran*, 779 F. App'x at 434 (noting, in addressing typicality, that there was no "meaningful differences in the PBM agreements that would result in the interests of the class representatives being misaligned with those of the absent class members")). Rather, "the record evidence suggest[ed] that some of the U&C language expressly included discount programs, and other language was silent on discount programs." *Id.* A determination that "some, none, or all of the class TPPs' contracts entitled them to [Health Plan Savings] pricing" is a question for the jury, "but this factual determination is not as overwhelming as Defendants have suggested." *Id.*

Likewise here, it would be premature for this Court to express a blanket opinion on if, and to what extent, Kroger's misreporting of U&C prices affected the classes of insured consumers, a merits question that remains for the jury to consider. *See id.*; *see also Corcoran v. CVS Health*, No. 15-CV-03504-YGR, 2017 WL 3873709, at *8 (N.D. Cal. Sept. 5, 2017) ("For the percentage of putative class members whose insurance provided them with out-of-pocket caps, damages can be determined by calculating the difference between those caps and what they would have paid had defendants submitted the correct U&C price. That some of these calculations will involve individualized and fact-specific determinations is insufficient to defeat class certification."), *rev'd and remanded on other grounds sub nom. Corcoran v. CVS Health Corp.*, 779 F. App'x 431 (9th Cir. 2019).

To the extent that individual contracts govern whether class members were entitled to Savings Club prices, those questions "can be adjudicated in an administratively feasible manner

43

with the use of subclasses," *Sheet Metal*, 540 F. Supp. 3d at 216, and the parties will have an opportunity to "confer before trial on which putative class members fall away as incurring no damages," *id.* at 216. As the court explained in *Sheet Metal*, "[s]hould there be a dispute over a subset of health plans, Defendants will have the opportunity to challenge their inclusion in the classes." *Id.* at 208 (citation omitted). And "[i]f later evidence disproves Plaintiffs' contentions that common issues predominate, 'the district court may consider at that point whether to modify or decertify the class.'" *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 520–21 (6th Cir. 2015) (quoting *Daffin*, 458 F.3d at 554); *see* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *Gen. Tel. Co.*, 457 U.S. at 160 ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."); *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions[.]").

Moreover, Kroger's argument that transaction-by-transaction differences predominate the Caremark claims is speculative at this point. As explained in Section III.A.1.b, *supra*, there is no evidence to suggest that Kroger took different approaches to its U&C reporting based on the customer's insurance, plan, or PBM. In deciding whether individual issues predominate over common questions, a court cannot rely on mere "speculation and surmise" that individual issues may arise. *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (internal quotation marks and citation omitted). Rather, "a court 'should consider only those issues that would *likely* arise if an individual class member's claims were being adjudicated on the merits.'" *Build Realty*, 343 F.R.D. at 406 (quoting *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021)); *see also Sandusky*, 863 F.3d at 468 ("[T]he key is to 'identify[ ] the substantive issues that will control the outcome,' in other words, courts should 'consider how a trial on the

merits would be conducted if a class were certified.'") (quoting *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008)).

Plaintiffs' theory here is that Kroger employed a scheme to overcharge insured individuals for prescription drugs by inflating its U&C prices. (*See* Order Denying Motion to Dismiss, ECF No. 42 at 20 ("As alleged, Kroger made its misrepresentations and omissions in a common manner (*i.e.*, by charging copayments calculated from an inflated usual and customary price), and class members responded by paying those charges.")). Kroger denies this, and, of course, this Court takes no position on the merits of Plaintiffs' overcharge claims. *See Eisen v. Carlisle Jacquelin,* 417 U.S. 156, 177-78 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *see also Daffin v. Ford Motor Co.,* 458 F.3d 549, 553 (6th Cir. 2006).   But if Plaintiffs' theory is ultimately supported with evidence, a jury could conclude that Kroger defrauded Ohio and Texas customers or was unjustly enriched irrespective of the particular facts of the individual customer's case. In such a case, class certification is appropriate, because "the factual issue of any scheme employed by the defendant and the legal issues involving interpretation of the [individual] manuals and determination whether the defendant's custom or policy constitutes unjust enrichment predominate over individualized inquiries." *See Hoving v. Laws. Title Ins. Co.*, 256 F.R.D. 555, 569–570 (E.D. Mich. 2009).

Kroger's argument that Medicare class members' claims of improper charges will turn on individualized circumstances also misreads Plaintiffs' theory of the case. Specifically, Kroger argues that a customer using Medicare Part D to purchase a prescription drug was entitled the U&C price only if the Kroger-PBM contract required it to. But in addition to being a merits-based question improper for resolution at this juncture, Kroger's argument subverts Plaintiffs' theory of

liability, which is that Medicare *entitles* its beneficiaries to pay the U&C price regardless of Kroger's individual contracts with other entities. Contrary to Kroger's argument, if Plaintiffs succeed on this theory—that Kroger was required to report its Savings Club price as its U&C price *and* charge Medicare Part D customers that lower price—Plaintiffs have shown by a preponderance of evidence that the facts and law supporting the claim of improper charges will predominate over individualized circumstances.

Finally, Kroger disputes Plaintiffs' methodology to calculate damages on a classwide basis. According to Plaintiffs' damages expert, Colin B. Weir, "the formula for this damages calculation is straightforward: Price Paid by Class Member – U&C Price = Damages." (ECF No. 76 at 27; *see* Section III.A.1 *supra*). The U&C price, "which refers to the Savings Club price charged for that same prescription and quantity," according to Mr. Weir, can be determined from Kroger's RxSC formulary (for tiered medications) and its transactional records (for non-tiered medications). (*Id.*).

Kroger casts doubt on the reliability of Weir's methodology by offering up their own experts' testimony to fault Weir's calculations for failing to account for: (1) plans setting an out-of-pocket maximum; and (2) health plan deductibles. According to Kroger, the damages analysis will require "a million individualized damages proceedings," because Plaintiffs "must 're-adjudicate' every claim for every class member in a plan year, which requires individualized review for each customer, given that benefit designs of health plans differ widely." (ECF No. 92 at 45). Kroger further contends that that the data required for this re-adjudication process is "*not contained in the Kroger Transaction Data produced in this matter*." (*Id.* (emphasis in original) (quoting Smith Report, ECF No. 92-9 ¶ 58)).

Plaintiffs, relying on expert testimony from Dr. Hayes, reply that "information about deductibles and out-of-pocket maximums are available in NCPDP standard data fields maintained by Pharmacy Benefit Managers." (ECF No. 105 at 21 (citation omitted)). As set out in Dr. Hayes'

Rebuttal Report and her live testimony, PBMs "regularly maintain data sufficient to determine whether the consumer and TPP payments associated with a given claim were determined by reference to the U&C price." (*See* Expert Rebuttal Report of Dr. Susan A. Hayes [hereinafter Hayes Report], Ex 113 to Pls.' Reply, ECF No. 105, ¶ 31). Specifically, NCPDP Fields 432-DN and 522-FM indicate that U&C pricing was applied when noted with Code 4, and NCPDP Field 223 indicates that a U&C charge was used when marked with Code 06. (*Id.* ¶¶ 36-48).

Plaintiffs have proffered a reasonable damages methodology that Weir admits is "illustrative or proof of concept" that damages can be calculated on a class-wide basis. (Hr'g Tr. vol. I, 101:10–13, March 19, 2025, ECF No. 144). At the hearing, Mr. Weir submitted that additional steps would need be to taken, including to code his software to automate the look-up functions and calculations, based on how Plaintiffs' theory defines U&C and Kroger's transactional data. (*Id.*). To the extent the equation needs to factor in additional variables like deductibles or out-of-pocket maximums, or more information from the PBMs, this Court concludes, based on the documentary and testimonial evidence presented by the parties, that Mr. Weir's damages model is capable of the task. Although the exercise may prove to be a laborious one, this Court is not persuaded that it is one that cannot be reasonably managed, and Plaintiffs plainly are willing to do the work. Thus, manageability concerns do not militate against certification.

Moreover, the fact that the damages calculation may involve some individualized analysis is not by itself sufficient to preclude certification. *See Olden v. Lafarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004) (stating that a Court may certify a class even if some individual questions remain as to damages, because a court can bifurcate the issue of liability from the issues of damages). Because "adjudication of questions of liability common to the [Ohio Caremark, Ohio Medicare, and Texas Caremark] class[es] will achieve economies of time and expense, . . . even if damages

are not provable in the aggregate," plaintiffs have satisfied the predominance requirement.  *See In re Whirlpool*, 722 F.3d at 860–61.

Having considered the relationship between the common and individual questions as to the Ohio Medicare Class, Ohio Caremark Class, and Texas Caremark Class, this Court is satisfied that the common questions predominate.

### b.    Superiority

For a class to be certified, the class method must also be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). At its core, the superiority analysis "aims to 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) (quoting *Windsor*, 521 U.S. at 615).

Where, as here, individual plaintiffs would have little financial incentive to bring individual suits, class treatment is appropriate. *See Windsor*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (internal quotation marks and citation omitted)); *In re Whirlpool*, 722 F.3d at 861 ("Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery.").

The potential recovery for many members of the Ohio Caremark, Texas Caremark, and Ohio Medicare classes, should they sue individually, may not exceed a few dollars. (*See* Hr'g Tr. vol. III, 93:21 –94:1, March 21, 2025, ECF No. 146 ("Rule 23 says . . . you have to still determine if it's manageable . . . And it may just result where we can't do it, even though I agree Ms. Kirkbride is not going to come for a $1.79 and sue us. I agree.")). The use of a class action is

48

therefore superior given the relatively small individual recoveries, which would also reduce an individual plaintiff's leverage in settlement negotiations. *See Build Realty*, 343 F.R.D. at 410.

Given the high number of claims, the relatively small amounts of damages per plaintiff, and the predominant common issues of law and fact, this Court finds that class action with respect to the three classes would be a superior method of adjudicating this controversy. A class action would, in short, achieve "economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *See* Fed. R. Civ. P. 23(b)(3), advisory committee's note.

### c.      *Ascertainability*

The Sixth Circuit recognizes "ascertainability" as an implicit requirement for class certification, meaning the class definition must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member[.]" *Sandusky*, 863 F.3d at 471 (internal quotation marks and citation omitted)). For a class to be ascertainable, "the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young*, 693 F.3d at 538.

Kroger argues that Plaintiffs' class definitions require "individualized discovery and analysis to determine who was charged with U&C price as a contributing factor," and thus certification is improper. (ECF No. 92 at 40 n. 27). A court, however, need not deny class certification due to the need to review individual files. *Young*, 693 F.3d at 540. Otherwise, "defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained." *Id.* (internal quotation omitted). As the Sixth Circuit explained:

> It is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies.

*Id.* Kroger nonetheless argues that Plaintiffs' proposed Ohio Medicare class is not ascertainable because it involves persons who paid for prescription drugs from Kroger "using their Medicare supplement insurance," also known as Medigap, which has not included prescription-drug coverage since 2005. (ECF No. 92 at 51). In reply, Plaintiffs concede that they "mistakenly defined that class with reference to 'Medicare supplement insurance' rather than 'Medicare Part D.'" (ECF No. 105 at 25–26). Kroger's criticisms, though well-taken, can be remedied because "district courts have broad discretion to modify class definitions." *Powers*, 501 F.3d at 619; *Kopaleishvili v. Uzbek Logistics, Inc.*, 2019 WL 6609212, at *3 (S.D. Ohio Dec. 5, 2019) (allowing plaintiffs to revise the class definition in a reply in support of certification to address deficiency arguments raised in an opposition).

After carefully reviewing the expert reports and considering Plaintiffs' amended class definitions, this Court is satisfied that the universe of class members is identifiable in an administratively feasible manner, and that common issues of liability will predominate at trial. Although some PBM contracts may exclude Savings Club prices from the U&C definition during the class period and some do not, whether a Kroger customer is a member of the proposed classes is objectively ascertainable from either documents (i.e., contracts), datasets, or third-party discovery. *See Sheet Metal*, 540 F. Supp. 3d at 202 ("The Court is satisfied that the universe of [TPP class members] is identifiable in an administratively feasible manner through requests for production . . . and subpoenas to third-party PBMs."). As Plaintiffs explain, Kroger's transactional data shows whether a transaction involved Medicare, or whether other TPPs used Caremark as

PBMs. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 308 (3d Cir. 2013) ("Although some evidence used to satisfy ascertainability, such as corporate records, will actually identify class members at the certification stage, ascertainability only requires the plaintiff to show that class members *can* be identified." (emphasis added)).

To the extent additional discovery reveals defects in ascertainability or Plaintiffs' theories of liability or damages on a classwide basis, this Court will entertain motions to decertify, modify class definitions, or define additional subclasses as appropriate. *See Rikos*, 799 F.3d at 520-21 (noting that district court may, at a later point in the litigation, "choose to revisit the issue of class certification" given that "Federal Rule of Civil Procedure 23 provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court") (internal quotation marks and citation omitted). "This possibility, however, is not a reason to deny class certification now when Plaintiffs have demonstrated that their current theory of liability will be proved or disproved through scientific evidence that applies classwide." *Rikos*, 799 F.3d at 521; *see also Brown v. Kelly*, 609 F.3d 467, 486 (2d Cir. 2010) ("The district court, of course, possesses tools with which to manage the individualized inquiries that this action may require, including creating subclasses, decertifying the class with respect to claims where individualized inquiries become too burdensome, and holding separate trials for plaintiffs subject to individual defenses that remain after the common questions of law and fact are resolved. We leave the management of these issues to the sound discretion of the court.").

## IV.    CONCLUSION

For the foregoing reasons, this Court finds that Plaintiffs have satisfied the requirements of Federal Rule of Evidence 702 to admit the expert testimony of Colin B. Weir and Dr. Susan A. Hayes, and the requirements of Federal Rule of Civil Procedure 23 to certify the Ohio Medicare Class, the Ohio Caremark Class, and the Texas Caremark Class. Accordingly, Defendant's motions to exclude (ECF Nos. 94, 110, 111) are **DENIED**; and Plaintiffs' Motion for Class Certification (ECF No. 76) is **GRANTED**. Defendant's motion for leave to file a sur-reply (ECF No. 112) and motion to seal its sur-rebuttal expert report (ECF No. 113) are **GRANTED** for the reasons stated on the record at the March 13, 2025 status conference.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATE: April 9, 2025**